# Lehigh and New England Railroad Company, Appellant, *v.* The Public Service Commission of the Commonwealth of Pennsylvania.

*Public Service Commission—Railroad companies—Rates—Intrastate freight rates—Jurisdiction of Public Service Commission—Transportation Act of 1920—Reparation.*

The Public Service Commission of Pennsylvania has power to regulate intrastate freight rates for carrying coal during the two-year period subsequent to the termination of federal control, where such regulation does not interfere with or show discrimination against interstate commerce.

The Transportation Act of 1920 conferring upon the Interstate Commerce Commission power to remove any "undue, unreasonable and unjust discrimination against interstate or foreign commerce" does not deprive the Pennsylvania Public Service Commission of the power to fix a rate which does not work such discrimination or interference.

Under the provisions of the Public Service Company Law the orders of the commission on appeal are "prima facie evidence of the reasonableness thereof," and unless the appellate court can find that the order appealed from is unreasonable or based upon incompetent evidence, materially affecting the determination or order of the commission, or is otherwise not in conformity with law, it will be confirmed.

Where the finding of the Public Service Commission that a rate is excessive is based on sufficient evidence the Superior Court will not reverse.

A rate fixed by the Public Service Commission will not be considered confiscatory except in a clear case.

No appeal may be taken from an order for reparation. A petition for reparation should not be filed until after final determination of the reasonable rate.

N. Y. & P. Co. v. N. Y. C. R. R. Co., 267 Pa. 64, followed.

Argued April 24, 1922. Appeal, No. 15, Oct. T., 1922, by Lehigh and New England Railroad Company, from order of the Public Service Commission, Complaint Docket No. 2364, 1920, in the case of Pennsylvania Power & Light Company v. Lehigh and New England Railroad

Company.   Before ORLADY, P. J., PORTER, HENDERSON,
KELLER, LINN and GAWTHROP, JJ.   Affirmed.

Complaint against Lehigh and New England Railroad Company that an intrastate freight rate of $.40 per gross ton for hauling coal was unjust and unreasonable and that a further increase of 40% would be likewise unlawful.

The facts are stated in the opinion of the Superior Court.

The commission made the following order:

This matter being before the Public Service Commission of the Commonwealth of Pennsylvania upon complaint and answer on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the commission having on the date hereof made and filed of record a report containing its findings of fact and conclusions thereon, which said report is hereby approved and made part hereof;

Now, to wit, October 25, 1921, it is ordered: That the complaint in this case be and the same is hereby sustained and that the Lehigh and New England Railroad Company, respondent, within fifteen days from the date of the service of this order file, post and publish, effective upon one day's notice to the public and this commission, a tariff schedule which will provide a rate of thirty-five (35c) cents per gross ton for the transportation of buckwheat coal, culm and bank dirt in carloads from collieries and washeries at Coaldale, Hauto, Hauto (Storage Yards), Lansford, Nesquehoning, Seek or Tamaqua, Pennsylvania, to the power plant of the Pennsylvania Power and Light Company at Hauto, Pennsylvania, in accordance with the findings and determinations of the commission contained in the foregoing report.

It is further ordered: That the rate hereby ordered shall supersede the rate of seventy (70c) cents per gross ton on buckwheat coal, culm and bank dirt, as contained

in respondent's tariff P. S. C. Pa. 1240, and the rate of fifty-six (56c) cents per gross ton on anthracite boiler fuel, sizes rice and smaller, as contained in respondent's tariff P. S. C. Pa. No. 1203, in so far as it applies to respondent's power plant at Hauto, Pennsylvania.

The commission retains jurisdiction of the case in the matter of reparation.

*Errors assigned,* among others, were various findings of fact and the order of the commission.

*Wm. J. Turner* and *Paul C. Hamlin,* for appellant.— The complaint was filed before the termination of the federal guaranty period, and under the express provisions of the Transportation Act of 1920, the state commission was without jurisdiction at the inception of the proceeding and nothing which subsequently transpired could vest such jurisdiction in that commission: Mollan v. Torrance, 9 Wheaton 537, 6 L. Ed. 154; Hardenbergh v. Ray, 151 U. S. 112.

The regulation of the rate by the Pennsylvania commission was an interference with interstate commerce: Ex Parte 74, 58 I. C. C. R. 220; Railroad Commission of Wisconsin v. C. B. & Q. R. R. Co., 42 Supreme Court Reports 236; State of New York v. U. S. and I. C. C., 42 Supreme Court Reports 245; Simpson et al. v. Shepard et al., 230 U. S. 352; Houston East and West Texas Railway Company et al. v. U. S., 234 U. S. 342.

The rate as fixed by the Public Service Commission was not based on the sufficient evidence and was discriminatory.

*Thomas J. Perkins,* and with him *Butz & Rupp,* for appellee.—The Pennsylvania commission had full jurisdiction in this case. If the appellant believes that such action creates a discrimination against interstate commerce, it can file a complaint with the Interstate Commerce Commission. The mere fact that the intrastate

revenue was reduced does not necessarily work a discrimination against interstate commerce.

The fixing of a rate is an administrative function of the Public Service Commission and a court cannot substitute its own judgment for that of the commission. The present rate being reasonable, must be sustained: Florida East Coast Ry. Co. v. United States, 234 U. S. 167; Interstate Commerce Commission v. Louisville & Nashville Railroad Co., 227 U. S. 88; Salt Lake City et al. v. Utah Light & Traction Co., P. U. R. 1918, F 377; State Public Utilities Commission v. Chicago, etc., Ry. Co., P. U. R. 1919, D 315; State Public Utilities Commission v. Terminal R. R. Association of St. Louis et al., P. U. R. 1918, B. 387; Clarksburg Light & Heat Co. v. Public Service Commission, P. U. R. 1920, A 639; Potomac Electric Power Co. v. Public Utilities Commission of the District of Columbia, P. U. R. 1920, C 326; City of Detroit v. Michigan R. R. Commission et al., P. U. R. 1920, D 867; Atchison, Topeka & Santa Fe Ry. Co. et al. v. Public Utilities Commission et al., P. U. R. 1920, D 801; Mount Union Borough v. Mount Union Water Co., 63 Pa. Superior Ct. 337; West Virginia Pulp & Paper Co. v. Public Service Commission, 65 Pa. Superior Ct. 5; Baltimore & Ohio R. R. Co. v. Public Service Commission, 66 Pa. Superior Ct. 403; Jenkins Township v. Public Service Commission, 65 Pa. Superior Ct. 122; Buffalo & Lake Erie Traction Co. v. Public Service Commission, 67 Pa. Superior Ct. 581; Schuylkill Ry. Co. v. Public Service Commission and Lehigh Valley Railroad Company, 71 Pa. Superior Ct. 204.

*Frank M. Hunter,* Counsel, and with him *John Fox Weiss,* Assistant Counsel, for the Public Service Commission.

OPINION BY LINN, J., October 9, 1922:

On August 24, 1920, the intervening appellee complained to the Public Service Commission that an an-

thracite coal freight rate of 40 cents per ton, collected by appellant railroad company since the termination of federal control, March 1, 1920, was unreasonable and unduly preferential, and that a 40% increase proposed to be made effective on August 26, 1920, would be likewise unlawful. Complainant asked for a reasonable rate and reparation. The railroad company answered. The commission heard the case, and, on October 25, 1921, decided the rate was unreasonable to the extent it exceeded 35 cents a ton, and made an order requiring the railroad company to file a tariff providing a rate of 35 cents a ton and retaining "jurisdiction of the case in the matter of reparation." A rehearing was asked for and refused, whereupon this appeal was taken.

1. Appellant first contends that the commission lacks power to regulate the rate during the period of two years beginning March 1, 1920. This objection is based on the Transportation Act of 1920 (41 Stat. at L., 484, Chap. 91) amending the Interstate Commerce Act, and generally prescribing conditions under which federal control of railroads was relinquished. Federal control continued from January 1, 1918, until February 29, 1920. Section 209 of the Transportation Act established a guaranty period of six months beginning March 1, 1920, during which the United States would make various guaranties there specified, one of which appellant accepted. The complaint of the power company assailed a rate effective during the guaranty period.

In considering the Transportation Act, in Railroad Commission of Wisconsin et al. v. C. B. & Q. R. R. Co., 42 Sup. Ct. Rep. 236, Chief Justice TAFT said: "From January 1, 1918, until March 1, 1920, when the Transportation Act went into effect, the common carriers by steam railroad of the country were operated by the federal government. Due to the rapid rise in the prices of material and labor in 1918 and 1919, the expense of their operation had enormously increased by the time it was proposed to return the railroads to their owners. The

owners insisted that their properties could not be turned back to them by the Government for useful operation without provision to aid them to meet a situation in which they were likely to face a demoralizing lack of credit and income.  Congress acquiesced in this view. The Transportation Act of 1920 was the result.  It was adopted after elaborate investigations by the Interstate Commerce Committees of the two Houses......

"Under Title 4, amendments were made to the Interstate Commerce Act which included section 13, paragraphs 3 and 4, and section 15a......The former for the first time authorizes the Commission to deal directly with intrastate rates where they are unduly discriminating against interstate commerce,—a power already indirectly exercised as to persons and localities, with approval of this court, in the Shreveport and other cases. The latter, the most novel and most important feature of the act, requires the Commission so to prescribe rates as to enable the carriers as a whole, or in groups selected by the Commission, to earn an aggregate annual net railway operating income equal to a fair return on the aggregate value of the railway property used in transportation.  For two years, the return is to be 5½ per cent, with ½ per cent for improvements, and thereafter is to be fixed by the Commission......

"It is manifest from this very condensed recital that the act made a new departure.  Theretofore the control which Congress, through the Interstate Commerce Commission, exercised, was primarily for the purpose of preventing injustice by unreasonable or discriminatory rates against persons and localities, and the only provisions of the law that inured to the benefit of the carriers were the requirement that the rates should be reasonable in the sense of furnishing an adequate compensation for the particular service rendered, and the abolition of rebates. The new measure imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate rail-

way service for the people of the United States. This is expressly declared in section 15a to be one of the purposes of the bill.

"Intrastate rates and the income from them must play a most important part in maintaining an adequate national railway system. Twenty per cent of the gross freight receipts of the railroads of the country are from intrastate traffic, and fifty per cent of the passenger receipts. The ratio of the gross intrastate revenue to the interstate revenue is a little less than one to three. If the rates, on which such receipts are based, are to be fixed at a substantially lower level than in interstate traffic, the share which the intrastate traffic will contribute will be proportionately less. If the railways are to earn a fixed net percentage of income, the lower the intrastate rates, the higher the interstate rates may have to be. The effective operation of the act will reasonably and justly require that intrastate traffic should pay a fair proportionate share of the cost of maintaining an adequate railway system. Section 15a confers no power on the commission to deal with the intrastate rates. What is done under that section is to be done by the commission 'in the exercise of its powers to prescribe just and reasonable rates'; i. e., powers derived from previous amendments to the Interstate Commerce Act, which have never been construed or used to embrace the prescribing of intrastate rates. When we turn to chapter 4, section 13, however, and find the commission for the first time vested with direct power to remove 'any undue, unreasonable, or unjust discrimination against interstate or foreign commerce,' it is impossible to escape the dovetail relation between that provision and the purpose of section 15a. If that purpose is interfered with by a disparity of intrastate rates, the commission is authorized to end the disparity by directly removing it, because it is plainly an 'undue, unreasonable, and unjust disrimination against interstate or foreign

commerce,' within the ordinary meaning of those words......

"Commerce is a unit and does not regard state lines, and while, under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the nation, cannot exercise complete, effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of state authority or a violation of the proviso......

"Congress in its control of its interstate commerce system, is seeking in the Transportation Act to make the system adequate to the needs of the country by securing for it a reasonably compensatory return for all the work it does. The states are seeking to use that same system for intrastate traffic. That entails large duties and expenditures on the interstate commerce system which may burden it unless compensation is received for the intrastate business reasonably proportionate to that for the interstate business. Congress, as the dominant controller of interstate commerce, may, therefore, restrain undue limitation of the earning power of the interstate commerce system in doing state work. The affirmative power of Congress in developing interstate commerce agencies is clear: Wilson v. Shaw, 204 U. S. 24; Luxton v. North River Bridge Co., 153 U. S. 525; California v. Central P. R. R. Co., 127 U. S. 1, 39. In such development, it can impose any reasonable condition on a state's use of interstate carriers for intrastate commerce it deems necessary or desirable."

Appellant relies upon that decision and upon the decision in New York v. United States et al., decided the same day and reported in 42 Sup. Ct. Rep. 245, for the proposition that the effect of the order appealed from is to make such reduction in appellant's intrastate earnings as to constitute unjust discrimination against interstate commerce on its line.

Section 422 of the Transportation Act enlarged the powers of the Interstate Commerce Commission by providing as follows: "(2) In the exercise of its power to prescribe just and reasonable rates the commission shall initiate, modify, establish or adjust such rates so that carriers as a whole, (or as a whole in each of such rate groups or territories as the commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation: Provided that the commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different sections of the country. (3) The commission shall from time to time determine and make public what percentage of such aggregate property value constitutes a fair return thereon, and such percentage shall be uniform for all rate groups or territories which may be designated by the commission. In making such determination it shall give due consideration, among other things, to the transportation needs of the country and the necessity (under honest, efficient and economical management of existing transportation facilities) of enlarging such facilities in order to provide the people of the United States with adequate transportation. Provided, That during the two years beginning March 1, 1922, the commission shall take as such fair return a sum equal to 5½ per centum of such aggregate value, but may, in its discretion, add thereto a sum not exceeding one-half of one per centum of such aggregate value to make provision......"

Subsequent paragraphs of this section provide for disposition of such part of the net operating income of any railroad as shall exceed a fair return.

Accordingly, during the guaranty period, the Interstate Commerce Commission conducted the investigation so authorized by Congress, and on July 29, 1920, approved an increase of 40% in the freight rates of certain carriers, appellant among them, and concluded: "We are of opinion and find that the following percentage increases in the charges for freight service, including switching and special services......would under present conditions result in rates not unreasonable in the aggregate under section 1 of the act and would enable the carriers......under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures, and equipment, to earn an aggregate annual railway operating income equal, as nearly as may be, to a return of 5½ per cent upon the aggregate value, for the purposes of this proceeding, of the railway property of such carriers held for and used in the service of transportation and one-half of one per cent in addition; eastern group 40 per cent......" (Ex parte 74, 58 I. C. C. p. 246).

It was pursuant to that conclusion that appellant on August 26, 1920, made the 40% increase in the 40-cent rate theretofore charged. That rate had originally become 40 cents during federal control, as a result of certain negotiations between the power company and an agent of the Railroad Administration, which need not now be stated.

The power company operates a large power plant at Hauto, Carbon County, Pa., annually consuming nearly 400,000 tons of No. 3 buckwheat coal. Hauto is on appellant's road in the Panther Creek anthracite mining district extending from Tamaqua on the west to Nesquehoning on the east, a distance of about ten miles. The power plant is about .7 of a mile from Hauto station, and is reached by a spur track owned by the power company. The average haul of the coal consigned to the power company is 3.8 miles, and the traffic is of course wholly intrastate. Concerning the dispute in the record as to

which of several possibly applicable tariffs furnished the freight rate for this coal, we need now only say that as but one of them specified Power House, Hauto, Pa., as a destination, it was applicable.

The record does not contain a separation of interstate and intrastate earnings. Exhibit 34 indicates that appellant's gross operating revenue for 1920 was $4,-842,965; Exhibit 1 shows the entire freight revenue for 1920 was $4,616,927, leaving operating revenue from all other sources of $226,038. Of the total freight revenue ($4,616,927), 57.57% was received for hauling anthracite coal. The total freight tonnage was 6,881,496 tons, of which 55.34% (3,808,009 tons) was anthracite coal. Of that quantity, appellant delivered to complainant 372,414 tons, or almost 10%. Three million, three hundred and two thousand, five hundred and nine (3,302,509) tons out of the total anthracite tonnage originated on appellant's line. On the power company's annual consumption of 372,414 tons, the reduction from 56 to 35 cents a ton will amount to $78,206.94; counsel for the power company state the reduction "on the business of a full year" at "upwards of $75,000." This probable reduction therefore amounts to almost 7% of the annual rental (apparently about $1,125,700) paid by the government during federal control. On those facts, appellant contends that to take about $78,000 per year from its gross freight revenue of only $4,617,000 from both classes of commerce, (of which 81.34% in 1920 went for operating expenses), is to place a burden equal to that reduction upon its interstate commerce, and unjustly to discriminate against that commerce by substantially altering the relation between the two which the Interstate Commerce Commission established in Ex Parte 74.

In that proceeding, the Interstate Commerce Commission recognized the probable necessity for correction and adjustment of inequalities in rate incident to the uniform increase approved, for it provided " . . . . . . It is impracticable at this time to adjust all of the rates on

individual commodities. The rates to be established on the basis hereinbefore approved must necessarily be subject to such readjustments as the facts may warrant. It is conceded by the carriers that readjustments will be necessary. It is expected that shippers will take these matters up in the first instance with the carriers, and the latter will be expected to deal promptly and effectively therewith, to the end that necessary readjustments may be made in as many instances as practicable without appeal to us."

The question then is whether the Public Service Commission had power to regulate this intrastate rate in such way as to cause an annual reduction of $78,000 in the aggregate revenue possibly earnable from both classes of commerce during the two-year period at the rates so adjusted by the Interstate Commerce Commission, or whether it is the duty of the Interstate Commerce Commission to make a general adjustment. As it was not intended that carriers should charge unlawful rates, we assume for the purposes of considering this point, that the increased rate was unreasonable, as the commission found, to the extent that it exceeded 35 cents.

While it is true the record indicates a relatively large diminution in appellant's freight revenue resulting from the reduction ordered, we must hold that it does not show discrimination against interstate commerce. There is no interstate rate with which to compare the intrastate rate in question; nor is there other evidence for comparison, to indicate how, if at all, the reduction will affect interstate commerce. In the Wisconsin case (supra) it appeared that the interstate passenger rate was 3.6 cents a mile, while the state proposed that the intrastate passenger rate should be 2 cents a mile, which, if enforced, would result in a reduction of $6,000,000 gross revenue; the record showed a different measure of charge for practically the same service. The New York case was substantially to the same effect; see also in re Intrastate Rates in Illinois, 59 I. C. C. Rep. 350, and

Arkansas Rates and Fares, 59 I. C. C. Rep. 471. In the record before us, we have no evidence permitting such conclusion.

2. The second objection to the order is that the evidence does not show the rate was unreasonable. There was evidence both ways. Appellant offered no evidence of the cost of performing the service in question, or of the value of its property used and useful therefor; nor is there evidence of the value of the service to the shipper or consignee though the character is described. The power company furnished an estimate of the cost of performing the service from which both parties draw conclusions said to support their respective contentions. The commission fixed a rate in excess of what the power company contended the evidence justified.

We are asked to set aside the inferences made by the commission and to adopt those suggested by appellant. Whether we may do so or not, depends on the statute. For the purposes of this appeal, the statute makes the ultimate conclusion of the commission "prima facie evidence of the reasonableness thereof," so that we must dismiss the appeal, unless we can "upon the record find that the order appealed from is [1] unreasonable or [2] based upon incompetent evidence materially affecting the determination or order of the commission, or [3] is otherwise not in conformity with law" (article VI, sections 23, 24). But it has repeatedly been held that we may not set aside an order which has adequate evidence to sustain it, merely because we might have reached a different conclusion from the evidence: Mount Union Boro. v. Water Co., 63 Pa. Superior Ct. 337, 341; West Virginia P. & P. Co. v. Pub. Ser. Comm., 65 Pa. Superior Ct. 5, 8; I. C. C. v. U. P. R. R. Co., 222 U. S. 541, 547; I. C. C. v. L. & N. R. R. Co., 227 U. S. 88, 92. Applying the rule so limiting our consideration of the record, we cannot sustain the contention that the commission erred in holding the rate unreasonable to the extent it exceeded 35 cents. We may note that during federal con-

trol the power company's predecessor, whose rights it possesses, filed a complaint with the Interstate Commerce Commission complaining that the same rate involved at bar, then 40 cents, was unreasonable during federal control, and asking reparation. On substantially the same evidence as is before us, the record in that case having been offered in this, the Interstate Commerce Commission in July, 1922, adopted the same conclusion reached by the Pennsylvania Commission.

3. The third objection to the order is that the rate fixed—35 cents a ton—is confiscatory. It is well settled we may sustain that contention only in a clear case: P. R. R. v. Phila. Co., 220 Pa. 100. "It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest and if it rests upon disputed questions of fact, the invalidating facts must be proved. And this is true of asserted value as of other facts"; Minnesota Rate cases, 230 U. S. 352, 452.

What, then, are the facts proved? As has appeared, complainant produced evidence of the estimated cost of rendering the particular service in question; appellant offered no evidence on the subject but sought to justify its rate by deductions from complainant's evidence of cost; on a consideration of that evidence, two commissions, as we have stated, inclined towards the conclusions of complainant and against the inferences suggested by appellant. In adopting the rate, the commission not only allowed all of the estimated cost and profit suggested by complainant's evidence, but substantially more. There was no evidence indicating the value of appellant's property used and useful in performing this service. There is a statement by a witness that "on December 31, 1920, the book value of the company's property used in transportation service was $17,464,152." By using that sum as a rate base for its entire operating revenue, appellant says its rate of return for 1920, on $17,464,152 was

5.2% and that if the reduction ordered by the commission were made from its gross revenue, other traffic remaining the same, the rate of return would have been 4.8%. But to consider those inferences applicable to the particular traffic in question, we must make two assumptions which we are not permitted to make; first, that the so-called book value on December 31, 1920, was in fact the value of appellant's property used and useful within the accepted definition of a rate-base; and second, that all the other rates collected by appellant earned a proper return.    There is of course no doubt about the proposition for which the North Dakota case is cited (236 U. S. 585) that a state may not "establish a rate upon a particular commodity where the effect thereof is confiscatory, although the return to the carrier from its entire intrastate operations might be adequate."    But, in the absence of other proof on the subject, how can it be determined that a rate upon a commodity does not yield a fair return on the value of that part of the property used and useful in performing the service, without proof of the value of that part of the property for rate-making purposes?    What part of the $17,464,000 may properly be said to be the base on which to determine what a fair return from this particular traffic should be?    The record is silent on the subject.    For the reasons indicated we may not hold the order confiscatory.

4. Appellant objects that the commission retained "jurisdiction of the case in the matter of reparation."    It contends that the Transportation Act prohibits granting reparation by providing in section 208a that the rates in effect on February 29, 1920, when federal control terminated, "shall continue in force and effect until thereafter changed by state or federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare or charge shall be reduced ······unless such reduction or charge is approved by the [Interstate Commerce] Commission."    During federal control both interstate and intrastate rates were made

effective from time to time by the railroad administration, pursuant to Congressional authority. Necessarily during that period, state statutes prescribing how intrastate rates should become effective, were in abeyance. N. P. R. Co. v. North Dakota, 250 U. S. 135. In order that there might be no question that the rates prescribed by the railroad administration, and not the intrastate rates which had been effective pursuant to state statutes when federal control was taken, should continue effective on March 1, 1920, section 208a prescribed the status of the rates on the first of March, 1920, and until changed as specified. Whether or not the section prohibits the granting of reparation is not before us on this record; at best that part of the order is interlocutory. There is nothing showing what questions may be raised on the subject. Moreover, article VI, section 17 of the Public Service Company Law, July 26, 1913, P. L. 1374, provides that "......There shall be no appeal from any order for reparation made by the commission, but the suit may be brought as hereinbefore provided." Article V, section 5, provides for reparation specified, and it is apparent from the opinion written by Mr. Justice SIMPSON in N. Y. & P. Co. v. N. Y. C. R. R. Co., 267 Pa. 64, that article V, section 5 "plainly requires the petition for reparation to be filed after the final decision on the question of the reasonableness of the rates." Accordingly, the power company's prayer for reparation contained in the complaint that the rate was unreasonable, perhaps amounts to no more than notice that claim for reparation will be made if the rate be held unreasonable. We cannot reverse because the commission has given notice that it will hear a claim for reparation if presented by the power company.

5. Appellant finally asks that we reverse because the commission refused a rehearing. Three reasons for the rehearing are given: 1. To call attention to the commission's misapprehension of the testimony; 2. To supplement the evidence that other carriers charged sub-

stantially the same or higher rates for substantially the same service, by offering evidence of similarity of conditions governing the application of the rates; 3. "To substantiate the valuation of its property......$17,464,000, by giving the detailed items making up that amount ......"

It follows from what we have said that the items making up the total of $17,464,000 could not have changed our conclusion. As it does not appear that the information concerning the similarity of conditions governing the applicability of the rates charged by other carriers was not available before appellant closed its evidence, and as the evidence to which we have referred, concerning the cost of service was apparently persuasive with the commission, we do not consider the order unreasonable for failure to grant a rehearing.

The appeal is dismissed.