Bell Telephone Company of Pennsylvania, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued October 12 and 13, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Benjamin O. Frick,* with him *William H. Lamb* and *E. E. Mather, Jr.,* for appellant.

*A. Jere Creskoff,* with him *Joseph S. Kleinbard, Harry H. Frank* and *Edward Knuff,* for appellee.

OPINION BY KELLER, P. J., April 12, 1939:

This is an appeal by The Bell Telephone Company of Pennsylvania, (hereinafter called Bell Company), from an order of the Pennsylvania Public Utility Commission directing it to revise its intrastate toll rates for distances exceeding thirty-six miles so as to conform to the rates charged by American Telephone & Telegraph Company, (hereinafter called American Company), using appellant's facilities, for service over comparable distances in interstate service.

The order was based on a finding of the Commission, made after a full and extended hearing, that the toll rates charged by the appellant company for long distance service within the State of Pennsylvania were higher than the interstate rates, using the same facilities, for a like or even greater distance, and constituted unreasonable discrimination against intrastate patrons, in violation of section 304 of the Public Utility Law of May 28, 1937, P. L. 1053.

At the outset it may be stated that the appellant, both in its oral argument and in its reply brief, expressly disclaimed raising the question of *confiscation.* See

*Portland Ry., Light & Power Co. v. Railroad Commission of Oregon,* 229 U. S. 397, 413; *Lehigh & New England R. Co. v. P. S. C.,* 79 Pa. Superior Ct. 540, affirmed in 227 Pa. 493, 121 A. 205. It contended that the order was (1) without support in the evidence; and (2), therefore, arbitrary; and (3), in consequence, deprives it of its property without due process of law in violation of the Fourteenth Amendment; and (4) constitutes an interference with interstate commerce. Its argument may be boiled down, therefore, to (1) a denial of unreasonable discrimination against intrastate service or patrons and (2) an averment that the order of the Commission interferes with interstate commerce; for if the Commission's finding of unreasonable discrimination is sustained by competent evidence, the contention that appellant is deprived of its property without due process of law, in view of its express disclaimer that the order is confiscatory, must fall.

The Bell Company furnishes statewide telephone service to the public in Pennsylvania. It has no property or facilities outside the State of Pennsylvania, but by connections with American Company and other telephone companies, owned or controlled by American Company, it furnishes its subscribers and patrons with nationwide telephone service and even telephone service to distant lands. All of its common stock ($110,-000,000), is owned by American Company. A dividend of 8% per annum is paid on the common stock. Its 6½% preferred (non-voting) stock ($20,000,000), is in the hands of the investing public and commands a high premium.

American Company does no local business in Pennsylvania. It has no lines here used in local telephone service. It has long distance lines in Pennsylvania, which it uses for interstate service, and two long distance boards or exchanges—one in Philadelphia and one in Pittsburgh—but it does not perform any service between terminals wholly in Pennsylvania. Its poles,

lines and cables in the State are usually owned jointly with the Bell Company, and the exchanges, lines and individual facilities of the latter are always used in connecting a local subscriber in Pennsylvania with an American Company interstate long distance call. All of American Company's interstate calls in Pennsylvania must go through Bell Company's exchanges and lines. Bell Company makes no separation in its accounts between the cost of exchange or subscriber service and toll service, or of the cost of the use of its facilities by American Company. No separate valuation of toll property and local service property is kept. The relationship between the two companies is not merely that of parent and child, or holding company and subsidiary. It is much closer and more intricate. While most of Bell Company's separate business is intrastate, it is not wholly so. In connection with New Jersey Bell Telephone Company, Diamond State Telephone Company and perhaps some other American Company subsidiaries, by agreement with the American Company, it does some interstate telephone service without using any of American Company's cables or wires. For example, service between Philadelphia, Pa. and Camden, N. J., is directly accomplished between Bell Company and New Jersey Bell Telephone Company and no facilities of American Company are used. Such service, where it exists, is classified as (1) under license contracts, or (2) between privilege points, the former being less subject to change by American Company than the latter.

As a result of certain investigations instituted by Federal Communications Commission with respect to the long line telephone rates of American Company *and that commission's insistence on their substantial reduction,* American Company filed a new schedule of rates, which was approved by Federal Communications Commission, effective January 15, 1937, which called for a reduction of about $12,000,000 yearly from its pre-

vious rates. As a matter of fact, the gross revenue of the American Company was not reduced under the new schedule by anything near $12,000,000. As is often the case, additional business was received under the lower rate to make up for a considerable part of the reduction, but, because of increase in expenses, etc., there was a substantial reduction of net income.

In putting into effect the new rates American Company lowered its toll rates for distances in excess of thirty-six miles, and arranged for a like reduction in all interstate business of Bell Company with respect to calls put through at privilege points and where direct connection was made at certain other points without using any facilities of American Company. For example, the station to station, three minute, call between Harrisburg, Pa. and Camden, N. J. which had been sixty cents was reduced to fifty-five cents. Between Johnstown, Pa., and Camden, N. J., for the same kind of call, the rate was reduced from $1.05 to 85c; from Pittsburgh, Pa. to Camden, N. J. the rate was reduced from $1.15 to $1. This was done to "carry out the arrangement by the Federal Communications Commission" (p. 95a).

Since 1920, when any reductions had been made by American Company in its interstate rates and reflected in its interstate tolls, corresponding reductions were always made by Bell Company in its intrastate toll rates for comparable distances. This happened frequently,—"practically every year for the last five or six years" prior to November, 1937—, and every time a change was made interstate, Bell Company conformed as to intrastate toll rates (p. 139a). But as to the change made by the schedule effective January 15, 1937, Bell Company did not conform its intrastate toll rates. In one rate only was the Bell Company's toll rate lower than American Company's. For local calls, not more than six miles, Bell Company's rate has been five cents, while American Company's lowest rate is ten cents for

a distance not exceeding twelve miles. Bell Company made no change in this respect either. Its assistant vice-president, in charge of rates, rules and regulations connected with the furnishing of telephone service, testifying as a witness for the appellant, stated that he would not recommend such an increase; possibly because in the long run it would not prove profitable. Appellant's testimony showed that thirty per cent of all its toll messages, that is 22,914,874 out of 75,-940,870 for the year 1936, were for distances of six miles or less, and ninety-three and a half per cent were for distances less than forty-two miles.

The reason given by Bell Company for not conforming its intrastate toll rates to the interstate toll rates arranged for by American Company effective January 15, 1937, was that after consultation with the Public Service Commission of Pennsylvania, the predecessor of the present Public Utility Commission, in December 1936, it had made a reduction of its local or residence exchange rates, effective as to billings February 1, 1937, entailing a yearly reduction of $1,800,000, and that the company could not afford a further reduction, which it was estimated would amount to $600,000 gross, or $463,000 net, a year, or 42/100 of one per cent on its common stock. But it was brought out on the examination of appellant's witnesses, on November 16, 1937, that the actual receipts for the first ten months of 1937 plus the estimated receipts for November and December of that year showed gross receipts of $69,118,-769, as against $65,510,510, in 1936 and net receipts of $16,203,805, as against net receipts of $16,139,990 in 1936, so that notwithstanding considerable increases in wages, taxes, etc., both gross and net revenues had increased in 1937, the gross local service revenues affected by the reduction having increased nearly two million dollars, and the actual revenues for local service for the first ten months of 1937 being more than 86% of such revenues for the whole year 1936. It is

only fair to state that at the argument it was said that the actual receipts for November and December, 1937, had fallen below the estimated revenues, but it is a well known fact, of which we can take judicial notice, that there was a sharp and sudden business slump, recession or depression,—whatever you choose to call it—, beginning November 1937, which was largely responsible for this decline from estimated revenues and that the reduction of net revenue in 1937 below that of 1936 cannot be laid to the door of the reduction of local exchange rates. The apparent reduction was more than made up by the increased traffic.

The concrete result of the refusal of Bell Company to conform its intrastate rates with the interstate rates arranged for it by American Company is best shown by specific instances of the discrimination resulting therefrom against intrastate patrons or service, taken from complainants' 'Exhibit No. 4,' (p. 289a) as checked and corrected by appellant.

*Comparison of three minute initial period station to station intrastate toll rates with rates for interstate messages:*

| | Mileage | Rate | | Mileage | Rate Prior to 1-15-37 | Rate effective 1-15-37 |
|---|---|---|---|---|---|---|
| BETWEEN | | | and | | | |
| and Philadelphia | | | | Camden, N. J. (Interstate) | | |
| Coatesville | 36 | $ .30 | | 36 | $ .30 | $ .30 |
| Harrisburg | 98 | .60 | | 98 | .60 | .55 |
| Johnstown | 205 | 1.05 | | 205 | 1.05 | .85 |
| Pittsburgh | 267 | 1.15 | | 267 | 1.15 | 1.00 |
| Beaver Falls | 280 | 1.20 | | 280 | 1.20 | 1.00 |
| and New Castle, Pa. | | | and | Youngstown, Ohio | | |
| Wilkes-Barre | 251 | 1.10 | | 252 | 1.10 | .95 |
| Lancaster | 225 | 1.10 | | 240 | 1.10 | .90 |
| Harrisburg | 191 | 1.00 | | 205 | 1.05 | .85 |
| and Midland, Pa. | | | and | E. Liverpool, Ohio | | |
| Scranton | 261 | 1.15 | | 267 | 1.15 | 1.00 |
| Harrisburg | 190 | 1.00 | | 197 | 1.00 | .80 |
| Pottstown | 254 | 1.15 | | 261 | 1.15 | 1.00 |
| and Easton, Pa. | | | and | Philipsburg, N. J. | | |
| Altoona | 175 | .95 | | 175 | .95 | .75 |
| Washington, Pa. | 275 | 1.20 | | 275 | 1.20 | 1.00 |
| Harrisburg | 98 | .60 | | 98 | .60 | .55 |
| and Matamoras, Pa. | | | and | Port Jervis, N. Y. | | |
| Erie | 288 | 1.20 | | 288 | 1.20 | 1.05 |
| New Castle | 300 | 1.25 | | 300 | 1.25 | 1.05 |
| Harrisburg | 139 | .75 | | 139 | .75 | .65 |
| and Warren, Pa. | | | and | Jamestown, N. Y. | | |
| Harrisburg | 164 | .90 | | 177 | .95 | .75 |
| Chambersburg | 154 | .85 | | 169 | .90 | .75 |
| Johnstown | 111 | .70 | | 127 | .75 | .60 |
| and Sayre, Pa. | | | and | Elmira, N. Y. | | |
| Harrisburg | 120 | .70 | | 128 | .75 | .60 |
| Philadelphia | 159 | .85 | | 174 | .85 | .75 |
| York | 142 | .80 | | 152 | .85 | .70 |

This difference ranging from five cents to twenty cents in favor of interstate calls is increased when applied to person to person calls and conversations for over three minutes. The overtime rate, when the initial period rate is fifty-five cents, is fifteen cents for each additional minute, and when the initial period rate is sixty cents, the overtime rate is twenty cents per minute, so that a five minute station to station call from Harrisburg to Camden costs eighty-five cents, while a five minute station to station call from Harrisburg to Philadelphia costs one dollar.

Taking as an example Harrisburg to Philadelphia and Harrisburg to Camden, it must be remembered that the call to Camden, N. J. uses precisely the same exchanges, lines, facilities, etc., as the call to Philadelphia, and in addition requires connection with another exchange and the use of facilities of New Jersey Bell Telephone Company at Camden,—for which by itself a charge of five cents is made, divided between Bell Company and New Jersey Bell Telephone Company—, and notwithstanding this additional service and the payment to the connecting company of part of the charge, the interstate rate is five cents less than the intrastate rate over the same line, in the same direction, which uses a part, but not all, of the same facilities and service.

This discrimination against intrastate service in Pennsylvania led the Public Utility Commission of its own motion to bring this proceeding against Bell Company as respondent, which resulted in the order appealed from.

We think the evidence in the case justified the finding by the Commission of unreasonable discrimination on the part of Bell Company, and that the order is not unreasonable or arbitrary.

### I.

Preliminarily, we may say, we do not agree with the learned counsel for appellant as to the construction

to be placed on section 304 of the Public Utility Law, supra, forbidding any public utility from making or granting any unreasonable preference or advantage to any person, corporation or municipal corporation, or subjecting any person, corporation or municipal corporation to any unreasonable prejudice or disadvantage; and forbidding any public utility from establishing or maintaining any unreasonable difference as to rates, either as between localities or as between classes of service. The section specifically provides that "unless specially authorized by the commission, no public utility shall make, demand or receive any greater rate in the aggregate for ...... the transmission of any message or conversation for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance." We do not understand that the provision of section 304 against any unreasonable discrimination in preferential treatment, rates, etc., is limited to advantages in favor of, or disadvantages against, *particular individuals,* whether persons or corporations. In our opinion, it extends to *classes* of persons, etc., affected by such discrimination, even though such classes are not fixed and may change from time to time. The prohibition extends to and covers unreasonable discrimination against customers or patrons of the utility whose toll service is intrastate, and in favor of those whose toll service is interstate. Furthermore, we think the present case comes expressly within the prohibition against establishing or maintaining any unreasonable difference as to rates "between classes of services"; and the section is specially applicable where, as here, the utility is demanding and receiving a greater rate for the transmission of a "message or conversation for a shorter than for a longer distance, over the same line or route in the same direction, the shorter being included within the longer distance." We have no doubt as to the application of section 304 to the case at hand.

We agree with the propositions of appellant that the mere fact that the rates of another company are different from those of appellant does not constitute discrimination at all; and that even where the rates are those of the same company, a mere difference in state-wide and nation-wide scales, of itself, would not support a finding of discrimination. But those propositions do not rule this case. Nor is the order in this case based on 100% ownership of Bell Company's stock by American Company. Mere stock ownership does not justify disregarding corporate identity or making one company's acts applicable to another; and appellant admits (pp. 27, 28) that there is nothing in the Commission's report and order to indicate that it relied on any such proposition.

But the relation between these two companies and the use of the facilities, exchanges and wires of Bell Company by American Company in the transmission of its business, is different from mere stock ownership, and justifies the Commission in its ruling that the intrastate service and patrons of Bell Company, which are under its supervision and regulation, shall not be unreasonably discriminated against to the advantage of those using the same facilities, in addition to other facilities of a connecting company, in interstate service. While the *form* of the order is that appellant revise its intrastate rates to "conform to the rates charged by American Telephone & Telegraph Company for service over comparable distances," its actual effect, as indicated in the report and argued by its counsel, is that appellant revise its rates for wholly intrastate service to conform to its rates, for comparable distances, charged for interstate service, which includes the very same service and facilities used in intrastate service; in other words that appellant shall not charge more for intrastate service than it charges for prescisely the same service, plus the additional service furnished by a connecting company, in interstate service. Appellant

argues that a difference in rates for similar services may be justified by a difference in circumstances. This is correct, but the argument does not help appellant. There *is* a difference here in circumstances—the interstate calls involve *more* service and equipment than the intrastate calls, and use the same service and equipment involved in intrastate calls, in the same direction. This difference would justify a greater charge for the interstate than the intrastate calls; it could not, however, justify a greater charge for the intrastate calls, which are the calls involved in this appeal. The order in the present case was based on the fact that no special circumstances were shown by appellant justifying such discrimination, and it was, therefore, unreasonable. This fact renders this case easily distinguishable from the case of *Louisville and Nashville Railroad Co. v. Eubank,* 184 U. S. 27, which is relied on by appellant. That case did not involve an appeal from an order of the Railroad Commission of Kentucky fixing intrastate rates, but was from a judgment obtained by Eubank in an action in a state court against the railroad company, based on section 218 of the constitution of Kentucky, providing that it shall be unlawful for a railroad company to charge or receive any greater compensation in the aggregate for the transportation of passengers or freight, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within the longer distance; provided that in special cases, the Railroad Commission may authorize this to be done. Eubank, who shipped tobacco from Franklin, Ky. to Louisville, Ky. a distance of 134 miles, was required to pay a rate of twenty-five cents per hundred pounds, while shippers from Nashville, Tenn. to Louisville, Ky. over the same road, a distance of 185 miles, paid only twelve cents per hundred pounds. The suit was brought to recover from the railroad company the difference of thirteen cents per hundred

pounds on 145,245 pounds shipped by plaintiff. The railroad company, in its answer, averred, inter alia, that the rate of twelve cents per hundred pounds had been made in conformity with the interstate commerce act, duly filed with and approved by the Interstate Commerce Commission; that Nashville was situated on the Cumberland River, navigable by boats plying between Nashville and points on the Ohio River, including Louisville, which transported tobacco from Nashville to Louisville at extremely low rates, and that if it charged any more than twelve cents per hundred pounds, it could not have secured the transportation of any of said tobacco; that it charged no rate on tobacco to Louisville, Ky. from any point in the State of Kentucky on the same line with Franklin and farther from Louisville than Franklin, less than the twenty-five cent rate charged from Franklin to Louisville; and that the rate of twenty-five cents per hundred pounds charged from Franklin to Louisville was lower than its standard tariff rates for that distance, and the less rate resulted from water transportation from Bowling Green, Ky.— which could be reached by wagon from Franklin—to Louisville, but for which it would have demanded and received a much higher rate, which higher rate would have been just and reasonable, and that the rate of twenty-five cents per hundred pounds was just and reasonable in itself by reason of such competition. The plaintiff, Eubank, demurred to these averments, thereby admitting the truth. In reversing the court below, the majority opinion in the Supreme Court said, inter alia, "In the case at bar the State claims only to regulate its local rates by the standard of the interstate rate, and says the former shall be no higher than the latter, but the direct effect of that provision is, as we have seen, to regulate the interstate rate, for to do any interstate business at the local rate is impossible, and if so, it must give up its interstate business or else reduce the local rate in proportion. That very result is a

hindrance to, an interference with, and a regulation of, commerce between the States, carried on, though it may be, by only a single company." It involved only one specific instance of discrimination in favor of the interstate service, for which there was a reasonable excuse, and did not relate to a general discrimination favoring all interstate points, for which there was no reasonable excuse, such as exists here.

Appellant makes the mistake, so often committed in citing opinions, of taking general expressions found in the opinion away from the setting of facts which justifies their use. It is clear from the opinion—even apart from the dissenting opinion of Mr. Justice BREWER, concurred in by Mr. Justice GRAY—that there can be no objection to a state, by its regulatory body, fixing an intrastate rate by using the standards adopted for interstate rates, provided it results in no hindrance to, or interference with, or regulation of, interstate commerce.

In *Illinois Commerce Commission v. United States*, 292 U. S. 474, 483, 485, 487, Mr. Justice STONE, speaking for the court said: "The decision [of the Interstate Commerce Commission] in the first proceeding, that the increase in interstate rates was reasonable, *was made in the hope that the state commissions would bring intrastate rates into harmony*. When they failed to do so, the Commission reaffirmed its finding that the new interstate rates were reasonable and found that the intrastate rates must be *raised* in order that the intrastate traffic may bear its fair share of the revenue burden. It is plain from the nature of the inquiry that the rate level, to which both classes of traffic were raised, was found reasonable on the basis of the traffic as a whole. Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no

occasion to deal with the reasonableness of the intrastate rates more specifically, or to separate intrastate and interstate costs and revenues ...... Similarly, the finding of unjust discrimination *against* interstate commerce made in the second report rests upon evidence. The effect of maintaining a *lower rate, intrastate,* than the *reasonable interstate rate* is necessarily discriminatory wherever the two classes of traffic, inextricably intermingled, are carried on, as in the District, under substantially the same conditions. ...... There can be no doubt that it was intended to prescribe for all *intrastate traffic* within the District the *same rate as that prescribed for all interstate traffic there,* and that interstate carriers whose rails are confined to either state and which for that reason have filed no interstate switching rates are nevertheless required to adopt the prescribed intrastate rate." (Italics supplied). See also, *Minnesota Rate Cases,* 230 U. S. 352; *Houston, East and West Texas Ry. Co. v. United States,* 234 U. S. 342, 357. Unjust discrimination may exist even though the preferential and prejudicial rates are not shown to be unreasonable: *United States v. Illinois Central R. Co.,* 263 U. S. 515, 524.

## II.

Much of what we have just said is likewise applicable to appellant's second contention, and supports the conclusion that the order of the Commission does not constitute a hindrance to, interference with, or regulation of, interstate commerce; and it must not be forgotten that unless the order has that effect it is not in conflict with the interstate commerce clause of the federal constitution.

Many of the cases cited and relied on by appellant on this branch of the case have no application or relevance to this case. For example, *Wisconsin R. R. Commission et al. v. Chicago, B. & Q. R. Co.,* 257 U. S. 563 and *Florida v. United States,* 282 U. S. 194, related to orders of the Interstate Commerce Commission which

required railroad companies to *increase* their intrastate rates in order not to produce an unjust discrimination against interstate traffic. In the former case the order of the Interstate Commerce Commission was not restricted to points affecting interstate travel, but applied to all intrastate fares, including fares between interior points, although they might not be near the border and might not work a discrimination against interstate travelers at all. In the latter case the order in the Interstate Commerce Commission, *increasing* the intrastate freight on logs, was statewide and applied to parts of Florida which made no shipments of logs in interstate traffic. In both cases the Supreme Court of the United States struck down the orders. But appellant has wholly misunderstood the reasoning in applying them to this case. The Interstate Commerce Commission has absolutely no right or authority to interfere with intrastate rates except to prevent an unjust discrimination against *interstate* traffic, and the orders in those cases were struck down by the Supreme Court because they were not restricted to *intrastate rates which produced discrimination against interstate travel or traffic,* as in *Houston, East and West Texas Ry. Co. v. United States,* 234 U. S. 342, 355, (the Shreveport case) and *Illinois Central R. Co. v. State Public Utilities Commission,* 245 U. S. 493, 506. It was the *limited* jurisdiction of the Interstate Commerce Commission over intrastate rates which caused the Supreme Court to strike down its orders requiring an increase of all intrastate rates, whether or not they produced discrimination against the interstate traffic, over which it had *general* jurisdiction. But the jurisdiction of the Pennsylvania Public Utility Commission over *intrastate* rates is general and plenary, and is limited only by the constitutional requirements that they be not unreasonable or confiscatory and do not result in discrimination *against* interstate traffic, over which the state commission has no jurisdiction or supervision at all. Hence its power

to issue statewide orders affecting intrastate rates is unquestioned, provided they are not unreasonable, do not amount to confiscation, and do not result in unjust discrimination *against* interstate traffic. The cases in which the Interstate Commerce Commission has ordered a change in intrastate rates in order to prevent discrimination against interstate traffic were all concerned with orders *increasing* intrastate rates so as to make them equal to interstate rates for comparable service. If the interstate rates are themselves just and reasonable and are not below the fair and reasonable rate demandable for the service, by reason of some special circumstance such as was present in the Eubank case, it is hard to see how there can be any discrimination against interstate traffic and in favor of intrastate traffic by an order of a state commission directing intrastate rates to conform to interstate rates.

There is absolutely no evidence in this case that the rates of American Company, which by arrangement with the Federal Communications Commission were made applicable to Bell Company's interstate service were not just and reasonable and did not produce a fair and reasonable return to the respective companies for the service performed. While the reduction was voluntary, in the sense that the rates were not imposed by an order of the Federal Communications Commission, they were the result of insistent demands of the Federal Communications Commission that the rates be reduced because they were exorbitant and unjust. We must assume, in the absence of all proof to the contrary, that the rates so established by the American Company and approved by the Federal Communications Commission are just, fair and reasonable to the utilities as well as to the public; for the Federal Communications Commission has no power or authority to *impose* an interstate rate on a utility company which would cause an unjust or unreasonable discrimination *against* intrastate traffic. The proof is, that since the establish-

ment of the interstate rates effective February 15, 1937 American Company has continued to pay dividends of nine per cent per annum on its common stock—(although the report of earnings may show that only eight per cent and a fraction was currently *earned*) and Bell Company has continued to pay eight per cent per annum on its common stock, and the evidence of appellant is, that if the lowered rate produces no additional revenue, the net loss in earnings due to the order appealed from would be 42/100 of one per cent on the common stock.

The appellant does not claim that the order results in confiscation of its property; possibly because it does not desire to have the Commission enter upon a valuaation of its property, used and useful in the public service, for rate making purposes.

In the light of the evidence in this record it is idle to suggest, much less to hold, that the order appealed from amounts to regulation of interstate service or rates, or is a hindrance to or interference with interstate telephonic traffic and communication.

Nor is the order invalid because it is not alternative in form, directing appellant either to raise its interstate rates or lower its intrastate rates, to conform. While such alternative form is frequently used, in order to avoid unjust discrimination, where the regulatory body has the power to order either, it is not obligatory, where as here, the Public Utility Commission has no power to make an order interfering with interstate rates. In the present case there is no alternative open which the Commission may impose on the appellant. If an unjust and unreasonable discrimination against intrastate service exists, which can be corrected only by a reduction of the intrastate rates to conform with the just and reasonable rates established for interstate service, the Public Utility Commission has the power to order it. See *Merchants Warehouse Co. v. United States et al.*, 283 U. S. 501, 513; *Texas & Pacific Ry. Co. v. United States*, 289 U. S. 627, 650.

The appeal is dismissed and the order of the Commission is affirmed. Costs to be paid by appellant.