## Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

520

Argued October 5, 1949. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (RENO, J., absent).

*Anne X. Alpern,* City Solicitor, with her *John M. Marshall,* Assistant City Solicitor, for City of Pittsburgh, appellant.

*Thomas M. Kerrigan,* with him *John E. Fullerton,* Assistant Counsel and *Charles E. Thomas,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*Charles K. Robinson,* with him *William Anderson,* for Trustees, Pittsburgh Railways Company and Pittsburgh Motor Coach Company, intervenor appellees.

*Maurice J. Dix,* with him *Prichard, Lawler, Malone & Geltz,* for Jules Guggenheim et al., security holders, intervenor appellees.

*R. A. Applegate,* with him *Rose, Eichenauer, Stewart & Rose,* for C. A. Sullivan et al., intervenors.

PER CURIAM, November 15, 1949:

On November 19, 1948, the Trustees of Pittsburgh Railways Company and of Pittsburgh Motor Coach Company, a wholly owned subsidiary of Pittsburgh Railways Company, filed new tariffs to become effective December 20, 1948. The principal changes under the proposed tariffs were to increase the basic street car fare from 10 cents to 12 cents, and the fare for through bus service from $12\frac{1}{2}$ cents to 15 cents.

The City of Pittsburgh, on November 24, 1948, filed a complaint docketed at C. 14500 against the new rates as proposed by both companies.

The Commission, by orders dated December 14, 1948, suspended the effective date of the proposed tariffs from December 20, 1948, to June 20, 1949,[1] and on the same date instituted inquiries and investigations against the existing and proposed rates of the two companies.

The Commission, by its order of January 10, 1949, upon motion of the City of Pittsburgh, consolidated for the purposes of hearing only the City's complaint at C. 14500 with the Commission's proceedings, C. 14540, C. 14541.

Previously the companies, on December 5, 1947, had filed new schedules of rates and fares which became effective January 5, 1948, increasing the basic fare from $8\frac{1}{3}$ cents to 10 cents.

On June 15, 1949, the Commission issued its orders (1) finding that the existing rates for rail, incline plane, and bus service were not producing an excessive return, and that the proposed rates for such service would not produce an excessive return, and accordingly terminated

---

[1] See section 308 (b), Art. III, of the Public Utility Law, May 28, 1937. P. L. 1053, 66 PS §1148.

its inquiries and investigations as of June 19, 1949, and (2) dismissing the complaint of the City of Pittsburgh. The City appealed from these orders of the Commission on June 18, 1949, and on July 7, 1949, this Court ordered that the appeals should operate as a supersedeas.

The Pittsburgh Railways Company, hereinafter referred to as "Railways," has an intricate corporate set-up. Ownership of the railway and incline plane properties operated by Railways is vested in part in Railways and in part in 53 street railway and incline plane underliers. The properties of the latter are operated by Railways under lease agreements with the underliers. The Pittsburgh Motor Coach Company, hereinafter referred to as "Motor Coach," is a wholly owned subsidiary of Railways. Motor Coach owns and operates all bus facilities. Certain of the bus facilities are used as feeder and shuttle lines with respect to rail operations, and the operation of these bus lines by Motor Coach is for the account of Railways. The balance of the bus operations is for certain through routes operating between downtown Pittsburgh and suburban areas. These routes are a separate operation from all transportation facilities of the two companies, and constitute a minor part of the over-all operation.[2]

Railways and Motor Coach furnish a coördinated street railway-bus service in the City of Pittsburgh and in 89 surrounding communities, having an approximate combined population of 1,400,000.

---

[2] In the record Railways has included, as part of its property and results of operations, the property of Motor Coach devoted to feeder and shuttle service and the results of the operation thereof, thus limiting consideration of Motor Coach to the property and operations related to through bus operation. The depreciated original cost as of December 31, 1948, of the through route bus property of Motor Coach was found by the Commission to be $345,823, exclusive of an allowance for cash working capital, materials, and supplies in the amount of $50,000.

Both Railways and its wholly owned subsidiary, Motor Coach, are debtors under the Federal Bankruptcy Act, and have been operated since June 14, 1938, by trustees appointed by the United States District Court.

These appeals by the City of Pittsburgh do not involve any question of confiscation of the property of the utilities. However, we may set aside the orders of the Commission and remand the record for "error of law or lack of evidence to support the finding, determination, or order of the commission . . ." Section 1107 of the Act of May 28, 1937, P. L. 1053, as amended by the Act of July 3, 1941, P. L. 267, §3, 66 PS §1437; *Pittsburgh v. Pennsylvania Public Utility Commission*, 158 Pa. Superior Ct. 229, 235, 44 A. 2d 614, 616.

The Commission found that the fair value of Railways for rate making purposes was $50,000,000. A 6½ per cent rate of return was allowed by the Commission. This rate applied to the finding of fair value would entitle Railways to receive an annual return of $3,250,000.[3]

Railways presented to the Commission three measures of value as of December 31, 1947. Railways gave $45,558,764 as depreciated original cost of its used and useful street railway, incline, and bus property. The Commission accepted Railways' original cost new determination as of December 31, 1947, as well as net additions to property accounts during the year 1948. Railways' depreciated reproduction cost figure for its property was $60,661,763. The third measure of value submitted by Railways was "reproduction cost new and less accrued depreciation based upon prices current as of December 31, 1947." The Commission refused to give consideration to this measure of value submitted by Railways for the reason that such reproduction cost at prices

---

[3] It is not clear from the record to what extent, if any, operating costs are affected by the involved corporate set-up of Railways, but the Commission recognizes in its brief, p. 39, that an accomplished reorganization may lower the rate base.

current at December 31, 1947, was not based upon the fair average price of materials, property, and labor as required by law. See *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 466, 51 A. 2d 497; *Blue Mountain Telephone and Telegraph Co. v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 327, 67 A. 2d 441.

The Commission, accepting five year average prices for the years 1943-1947 used by Railways, determined the depreciated reproduction cost as of December 31, 1948, at $57,244,140. But the Commission condemned the use of five year average prices covering 1943-1947 as follows: "With respect to this reproduction cost estimate, Railways has used five year average prices 1943-1947, a period embracing relatively high price levels. We believe, because of the impact of World War II, that an average of prices prevailing during the 10 years ended December 31, 1947, would have been more representative of the fair average price of materials, property and labor contemplated in the Public Utility Law." Notwithstanding its disapproval of five year average prices and its conclusion that they were unrepresentative, the Commission gave weight in determining the rate base to reproduction cost based on such averages. Either five year average prices were representative and entitled to be used in a finding of reproduction cost in this case or they were not. The weight to be given by the Commission to a reproduction cost finding is another matter. As this Court stated in *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 466, 51 A. 2d 497, 502: "It would be futile to attempt to determine fairly reproduction cost in an abnormal price situation. Reproduction cost under ordinary circumstances and reasonably stable prices is a theoretical value based upon uncertain and fugitive data. But the commission is not obliged to accept such estimates which would increase such theoretical value

where the economic conditions are uncertain and unstable. Such weight as the estimate may have depends largely upon the stability of the price level over a period of years. We do not believe that under any theory appellant is entitled to a finding of reproduction cost new or depreciated reflecting highly inflationary prices which are probably of temporary duration."

The Commission found the depreciated original cost of Railways' property as of December 31, 1948, to be $43,478,904. Original cost as of December 31, 1948, was fixed at $72,378,904, and the accrued depreciation at $28,900,000, leaving a depreciated original cost of $43,-478,904.[4] From the reproduction cost figure of $104,294,-932 based on five year average prices 1943-1947, with net additions during 1948 of $149,208, the Commission deducted adjusted accrued depreciation of $47,200,000 giving a depreciated reproduction cost of $57,244,140.[4] We recognize that accrued depreciation is essentially a judgment figure. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 393, 68 A. 2d 448. However, in considering the question of accrued depreciation, the Commission stated that Railways had failed to give proper consideration to the element of obsolescence. The Commission pointed out that, according to a survey made by an engineering firm, Railways' Exhibit 81A, a net decrease in depreciated original cost of over $2,000,000 could be brought about by abandonment of certain rail lines and the substitution of bus service therefor. The Commission also, in its report and order, states that in its reorganization plan, which was before the Commission and submitted of record by reference in the instant proceedings, Railways proposed the complete abandonment of thirteen and the partial abandonment of four street railway routes, involving a total original cost as of December

---

[4] This is exclusive of allowance for materials, supplies, and cash working capital of $2,025,000.

31, 1940, of approximately $4,770,000. And yet the Commission made no findings as to obsolescence, a factor which it recognized would be of much importance in the final determination of fair value. This Court has frequently referred to the importance of obsolescence as an element in determining accrued depreciation; this is especially true in the case of street railway transportation systems. *Solar Electric Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 366, 367, 9 A. 2d 447; *Philadelphia Transportation Co. v. Pennsylvania Public Utility Commission*, 155 Pa. Superior Ct. 9, 18, 37 A. 2d 138. Cf. *Blue Mountain Telephone and Telegraph Co. v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 320, 325, 67 A. 2d 441.

It is to be noted that this is the second recent increase in rates by Railways. As of November, 1947, the patrons of Railways paid an 8⅓ cent fare for street railway travel; an increase to 10 cents was made on January 5, 1948. And under the new tariffs the basic fare is to be 12 cents. This is an approximate increase of 50 per cent in transportation costs to the public in less than two years. It is evident that a point will be reached, if such is not already the case, where an increase in fares will yield less rather than greater net return. The Commission in its brief in the present appeals has said: "It goes without saying that, if the cost of labor and materials continue to rise, and if transportation costs become disproportionate to other costs resulting fares may become so high that the law of diminishing return may become accelerated and the riding public might well seek other forms of transportation." As stated in *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 475, 502, 34 A. 2d 375, 388: "When rates are increased above a certain maximum, the public is apt to turn to competitors or so curtail their

consumption that the net result is a loss rather than a gain to the utility." '

The property of a public utility is still private property, but it is property devoted to the public service and impressed with a public interest. *United Railways & Electric Co. of Baltimore v. West*, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. A public utility occupies a quasi public or quasi trustee position; and the rates to be paid by the public for the service rendered, which are intended to produce a fair return on the fair value of the used and useful property of a utility, must bear a relationship to the obligations which flow from such public status. "Every rate made, demanded, or received by any public utility, . . . shall be just and reasonable, and in conformity with regulations or orders of the commission": Section 301 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended by the Act of March 21, 1939, P. L. 10, No. 11, §2, 66 PS §1141. The Commission may indicate its judgment as to a proper schedule of rates. See *Pennsylvania Power & Light Co. v. Public Service Commission*, 128 Pa. Superior Ct. 195, 221, 193 A. 427.

It is a matter of common knowledge that the street railway systems of both Pittsburgh and Philadelphia have experienced substantial decline in gross revenues during the current calendar year of 1949. It is not apparent what part of this decline is due to consumer resistance to higher fares as compared to other causes. The Commission has frequently had occasion, in other cases which have come before this Court on appeal, to refer to the factor of consumer resistance to rate increases and to the law of diminishing returns as applied to such increases. In the present case Railways used 5 per cent to cover estimated loss in revenue due to decreased patronage resulting from consumer resistance to the proposed increased fares. The Commission reduced this estimate to 4.12 per cent in estimating

the future effect of the proposed fares. In any event, it is clear that the area of increased net return resulting from increased rates to the consumer is limited. In the present case, the proposed increased rates would yield an estimated amount of $3,353,618 above the gross revenue of $25,007,768 for 1948, making an estimated total gross revenue under the proposed increase of $28,361,386. It will serve no purpose to continue to increase rates to a point higher than the public will pay. Capital, labor, and the public will each have to bear a share of the burden resulting from inflated prices and costs if the utility is to survive. But it is apparent from this record that Railways' operating revenues, under the present rates, scarcely meet the operating expenses as found by the Commission. The operating revenues for 1948 under the existing rates were $25,007,768, and the operating expenses were $24,646,476, leaving income available for return of $361,292. The estimated operating revenues for 1949 under the proposed rates are $28,361,386, and the allowable operating expenses are $25,065,276, which would leave income available for return of $3,296,110. The through route operating revenues given by Motor Coach for 1948 were $1,179,226, and operating expenses $1,292,973; for 1949 the estimated revenue under the proposed rates is $1,297,872, and operating expenses $1,272,073. These figures are basically those of Railways and Motor Coach. Accepting the facts as disclosed by the record and as found by the Commission, it is obvious that the utilities are entitled to some increase in revenue in order for them to properly discharge their public duties.

We think there is merit in the statement of the City of Pittsburgh that the increase of the basic fare places an undue burden on short haul riders.[5] The City states that no comprehensive studies have been made as to zoning,

---

[5] These constitute largely single vehicle passengers in contrast to multiple vehicle or free transfer passengers.

or as to the more equitable distribution of transportation costs through the elimination of free transfers and the substitution of paid transfers. Commissioner Scragg, in his concurring opinion in the present case, aptly said: "Operators of urban transit companies should begin to recognize the fact that they are engaged in the business of mass transportation, and that when they get their rates above a base of 10 cents they are approaching the rates charged for luxury transportation and will inevitably price themselves out of the transportation market. They should cut their cloth to fit the pattern or the economics of the situation will do it for them and ultimately force them out of business. Constantly increasing rates is not the answer to the problem. Possibly rates proportioned to the distance traveled may be the answer." Even though the proposed rates may not produce an excessive return, as stated in the Commission's order, they may, nevertheless, be unjustly discriminatory. See section 304 of the Act of May 28, 1937, P. L. 1053, 66 PS §1144; *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission,* 135 Pa. Superior Ct. 218, 233, 5 A. 2d 410. Apparently the distance traveled does not determine the rate under the new tariffs. There may be differences in transportation rates between classes of travel which do not constitute unreasonable discrimination prohibited by the Public Utility Law. *Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 107, 63 A. 2d 391; *Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 447, 450, 15 A. 2d 473; *Alpha Portland Cement Co. v. Public Service Commission,* 84 Pa. Superior Ct. 255. But we are unable to determine on the present record whether the discrimination in rates in the new tariffs is logical, reasonable, and within " 'the flexible limit of judgment which belongs to the power to fix rates': Atlantic Coast Line v. N. Car. Corp. Com'n., 206 U. S. 1." See *Philadelphia v. Pennsyl-*

*vania Public Utility Commission*, 162 Pa. Superior Ct. 425, 432, 57 A. 2d 613; *Reading Coach Company v. Public Service Commission*, 125 Pa. Superior Ct. 493, 498, 190 A. 172.

The City complains of a 6½ per cent rate of return allowed to Railways by the Commission. Railways claimed an annual return of 7½ per cent of the fair value of its property. In this connection the Commission stated: "The claimed rate of return of 7½ per cent is on the record merely as the opinion of Railways, and is unsupported by any statistics or record. We will allow Railways 6½ per cent rate of return to be applied to our finding of fair value of $50,000,000."

Railways' claim for a 7½ per cent return was based upon one specific form of capitalization as a reorganized entity, and, as the Commission said, is unsupported by any statistics or records. The rate of return should not be based merely upon policy. The rate allowable is a fact to be determined from the evidence like any other fact. *Pennsylvania Power & Light Co. v. Public Service Commission*, supra, 128 Pa. Superior Ct. 195, 214, 193 A. 427; *Bluefield Water Works and Improvement Co. v. Public Service Commission*, 262 U. S. 679, 692, 43 S. Ct. 675, 67 L. Ed. 1176. As we said in *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission*, supra, 165 Pa. Superior Ct. 393, 403, 68 A. 2d 448, 454: "The rate of return is necessarily a variable depending on many factors; it should be adequate and may not be confiscatory. Solar Electric Co. v. Pennsylvania Public Utility Commission, supra, 137 Pa. Superior Ct. 325, 388, 9 A. 2d 447. . . ."

We are of the opinion that the Commission should receive further relevant evidence, if offered; that it make revised or further findings of fact as warranted by all the evidence; and that a schedule of rates and fares which are just, reasonable, and nondiscriminatory be fixed. The present record furnishes an inadequate basis

**532**

for final disposition of this case, and therefore it will be returned to the Commission for further action on the subjects to which we have referred.

The order of supersedeas of July 7, 1949, will be terminated, and the new tariffs filed on November 19, 1948, by Railways and Motor Coach, or such rates as the Commission may legally prescribe, should become effective pending further action by the Commission and the ultimate determination of a proper rate schedule.

The orders of the Commission are vacated, and the record is remitted to the Commission for further action and proceedings not inconsistent with this opinion.