Philadelphia Transportation Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued September 28, 1943.· Before KELLER, P. J.,

BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Frederic L. Ballard,* with him *Paul W. Bruton* and *Allen Hunter White, John C. Phillips,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellant.

*Paul D. Larimer,* with him *Frederick L. Kiger, Harold A. Scragg* and *James H. Duff,* Attorney General, for appellee.

*G. Coe Farrier,* Assistant City Solicitor, with him *Robert McCay Green,* City Solicitor, for City of Philadelphia, intervenor.

OPINION BY HIRT, J., April 18, 1944:

This proceeding had its beginning in new tariffs filed by Philadelphia Transportation Company in which it proposed to increase the cost of passenger travel on its street railways. In the course of the hearings before Pennsylvania Public Utility Commission, when it developed that higher fares were not necessary because of increases in earnings after the tariffs were filed, the proceeding nevertheless continued as an investigation

by the commission on its own motion to determine the fair value of the company's transportation properties and the permissible rate of return. Although we are not in entire accord with the conclusions of the commission, our order does not authorize increased fares nor disturb the present schedules of charges for railway, trackless trolley or bus travel in Philadelphia. Whether higher fares may be necessary at some time in the future will depend largely upon costs of operation, in periods of inflationary trend, as well as the degree of acceptance by the public generally, of the means of transportation which the company can supply.

Reference to a few historical facts will be helpful in the approach to the issues in this appeal: Philadelphia Rapid Transit Company, the predecessor operating company, became financially involved. In 1934 it applied to the United States District Court for the Eastern District of Pennsylvania for reorganization under section 77B of the National Bankruptcy Act. The problem was complex, ultimately involving the merger of all of the public passenger transportation facilities of the City of Philadelphia diversely owned by a number of corporations [1] each with its own capital structure. There was also a pyramiding of securities of various classes greatly in excess of the value of property upon which they were issued. Under that act, [2] approval by the appropriate State regulatory body was

---

[1] There were 25 street railway and traction companies, in addition to other companies wholly owned by one or more of the merging companies. The decree nisi recites that the merger involved "sixty-four so-called underliers." The scope of operation (excluding facilities owned by the city and by Delaware River Joint Commission) appears from the finding of the commission of 600 miles of surface track; 23 miles of subway-elevated track; nearly 400 miles of motorbus routes and about 5½ miles of trackless trolley routes.

[2] Subsection (e), subsection (2), of the United States Bankruptcy Code, 11 U.S.C.A. §207.

necessary to the confirmation of a reorganization plan by the district court. Accordingly such approval by the Pennsylvania Public Utility Commission was sought in this instance. Hearings on the application were begun in February and were concluded in June 1938. The scope and thoroughness of the inquiry is attested by more than 3,000 pages of testimony and 100 exhibits. That record is before us here. Over-capitalization and consequent inability to meet fixed charges were the chief reasons for the failure of the operating company, and the principal concern of the commission in evolving an acceptable reorganization plan was a write-down of fixed and contingent charges by limiting outstanding securities to an amount consistent with the value of the transportation properties involved in the proposed merger, with corresponding debt service demands in keeping with earning power. Accordingly, in the reorganization proceeding the commission addressed itself to: "(1) the original cost of the property in relation to the total amount of securities to be issued or assumed by the new corporation; (2) the past, present and future earning power of the property under reasonable rates; and (3) the distribution of securities among the various participants in the plan." From the testimony, the commission (limiting itself to the above considerations) by order on October 3, 1938 found the fair value of all used and useful property to be $105,419,769, less accrued depreciation of $31,000,000 as of October 1, 1937. That order restricted the aggregate amount of securities to be issued or assumed to $75,357,014. On reconsideration at the instance of the company, the commission on November 22, 1938, without specifically changing its findings as to value and depreciation, approved the issue or assumption of securities of a total face value of $85,015,193. In the order however, the commission stated that it was prompted to agree to this figure by a willingness to depart from its usual

rules and precedents (we assume, of conservatism in approving values in relation to capitalization) "in order to facilitate applicant's reorganization, so urgently needed by the public as well as by the holders of applicant's securities." Because of contract relationships between the operating company and the City of Philadelphia it was necessary also to secure the city's approval of the plan contemplated by the commission's order. This approval is evidenced by city ordinance dated May 20, 1939. Philadelphia Transportation Company, incorporated for the purpose of consummating the plan as approved, on January 1, 1940 by merger of the constituent companies, became the owner and operator of all franchises, facilities and properties of its predecessors with these exceptions: it operates Market Street Elevated Railway under lease from a wholly owned subsidiary; the city-owned Frankford Elevated and Broad Street Subway System, and the Delaware River Bridge high speed line became parts of the system under leases from the owners. In the interval between the date of the commission's order and the merger, the existing indebtedness was reduced somewhat by available sinking funds and other retirements. Accordingly the total par or stated values of securities issued or assumed by the present company was $84,149,119, representing $61,855,239 in long term funded debt and $22,293,880 in capital stock.

For more than a year after reorganization the earnings of the new company steadily increased and were adequate to meet operating expenses, interest and dividends. The increased revenues were sufficient also to justify a program of improvment including modernization of much existing equipment and the purchase of many new surface cars, trackless trolleys and busses.[3]

---

[3] The property was purged of many old and obsolete items. By December 1, 1941, 130 new surface cars of the most modern design, 50 trackless trolley cars, 323 new busses were added at

Because of the impact of increased costs of labor,[4] and other operating expense, net earnings receded in 1941 to a point which, in the opinion of the company, justified new tariffs increasing the fares on rail lines. The schedules as filed were to become effective January 15, 1942 but their operation was suspended by orders of the commission to October 15, 1942. In the meantime the City of Philadelphia filed its protest against the new tariffs and the commission started its investigation; consolidated hearings on the city's complaint and the commission's case were concluded in July 1942. By final order on October 13, 1942, applicable to both proceedings, the commission found that the fair value of the company's "used and useful property, as a going concern based on evidence as of December 31, 1941, is $77,000,000, including working capital and cost of financing; including also estimated costs of equipment to be purchased in 1942." The order fixed the rate of return on that valuation at 6%. As a matter of form the commission ordered a cancellation of the new schedules of rates and reestablished the old. Cumulatively, the assignments of error in Philadelphia Transportation Company's appeal challenge the order as confiscatory.

The commission in its decree nisi discussed the conventional elements (*Smyth v. Ames,* 169 U. S. 466, 18 S. Ct. 418) reflecting fair value. We are not in accord with the commission in the emphasis which it placed on its estimate of original cost and its failure to give

a total cost of $7,120,000. 289 old passenger cars were modernized at a cost of $434,668. In addition there were on order for delivery in 1942, 110 new surface cars, 10 trackless trolley cars, and 100 busses costing $3,325,093.

[4] Two wage increases became effective after the reorganization, one involving an additional annual operating cost of $1,500,000 and the other $500,000. The commission also refers to a demand for further increases in wages involving an additional annual expense of $2,500,000, then pending before the War Labor Board.

proper weight to reproduction costs. We think also that the amount of depreciation charged against each of these estimates is excessive. Other elements considered relevant by the commission must be ignored entirely. Specific items disallowed by the commission, in our opinion, must enter into any reasonable adjudication of a fair base. Other considerations are material to the question, among them, the order of the commission in the reorganization proceeding adjudicating fair value in support of corporate securities at $85,000,000. We will discuss the reasons for our conclusions, insofar as we do not agree with the commission, under appropriate headings.

*The Adjudication in the Reorganization Case.* Certainly the finding of $85,000,000 for a specific purpose is not res adjudicata here.[5] The commission stated and appellant agreed that the value found should not be binding in any other proceeding or for any other purpose. But the final order in that proceeding, about three years prior to the date upon which fair value was determined in the present case has a bearing on the reasonableness of the latter order. All of the evidence is that in the interval the position of the company was improved. Although after reorganization and prior to December 31, 1941, appellant spent $434,668 in modernizing existing equipment and acquired new cars and busses and other equipment costing $7,120,000, the commission found the value of appellant's property to be $8,000,000 less than its value for reorganization purposes before these additions. The first duty of the commission is to the public. In the reorganization case the intention was to wipe out fictitious capital structures by reducing securities to an amount which the value of the property would support. We must assume that the practical aspects of the problem did

[5] Cf. Public Utility Code of May 28, 1937, P. L. 1053, §§603, 918, 66 PS §§1243, 1358,

not prevent the commission from performing its duty in this respect or that the result was a compromise with the facts. Cf. Constitution of Pennsylvania, Art. 16, § 7. *McCandless v. Furlaud,* 296 U. S. 140, 161, 56 S. Ct. 41. In making the order the commission stated as its judgment that "the reduction in fixed charges is sufficiently close to the standard suggested by us as to make it unlikely that the new company will in the near future become financially embarrassed and be forced once more to undergo reorganization." The "standard" undoubtedly recognized the general principle that the fair value of property pledged for the payment of securities should at least equal their par or stated values. The decree nisi in that proceeding contains a thorough and critical analysis of all of the testimony indicating close scrutiny of every claim of property. Moreover the commission approved a valuation of $85,-000,000 wholly upon its finding of original cost depreciated, including cash and net assets other than fixed property. Thus it evidenced regard for the demands of conservatism in determining the amount of securities which the new corporation could afford to assume. On that issue, the commission did not trend original costs, translating them into dollar values on the date in question; and properly, perhaps, refused to consider reproduction costs less depreciation as evidence of total security issues which the property could support. The result, from the method applied, was an adjudication of value within safe bounds, for any purpose. Of course the commission may change its mind or convince itself that it was wrong. But in the absence of a rational basis for a change of position, the finding as it stands is evidence of the fair value of the property in 1941. It is difficult to reconcile the adjudication of $77,000,000 in the present case (resting upon reproduction cost, depreciated, as one of the elements considered) with $85,000,000 of value in the reorganization case based

upon depreciated original cost alone. The difference in purpose of the two proceedings does not wholly account for the difference in result.

The order establishing fair value in the present proceeding at $77,000,000 suggests that the commission may be too thoroughly resigned to the fact (emphasized by two of the commissioners in dissenting opinions in which much lower valuations were found) that street railway transportation is a "dying art." It is true that adverse evolutionary processes have had a devastating effect on appellant's property.[6] But it is no valid argument, because its property in the future may be worth less, that present values should be discounted to meet that possible contingency. Dealing inadequately with appellant will strengthen the forces of dissolution. The important fact is that appellant is performing an *indispensable* service in Philadelphia. So long as that service is essential and cannot be replaced, the interests of the public would seem to indicate the wisdom of allowing a reasonable return on a fair valuation to perpetuate the service rather than to hasten its end. Such treatment should supply the company with the incentive to continue to modernize its system and to provide facilities in the future meeting the demand, by conforming with new methods of transportation as they are developed.

In any view of the testimony, we think a valuation of $77,000,000 is low to the point of confiscation. We are of the opinion also that this is a case in which we may properly determine value (*Ohio Valley Water Co. v. Ben Avon Borough*, 253 U. S. 287, 40 S. Ct. 527) in an amount, but only in such amount as is clearly established by the evidence. The problem here is not as complex as in e. g., *Peoples Nat. Gas Co. v. Pa. P. U. C.*, 153 Pa. Superior Ct. 475, 34 A. 2d 375, and does not rest upon

---

[6] Compare present value with more than $200,000,000 approved in *City of Phila. v. Public Ser. Com.*, 84 Pa. Superior Ct. 135.

issues of fact nor inferences which are exclusively for the commission. An equally compelling reason is the uncertainty of the future and the speculative character of appellant's business. The prosperity which the company now enjoys is artificial and temporary. The activities of war work and the limitations on the use of private automobiles have created a demand for public transportation which have taxed appellant's facilities to the limit. To what extent purchases of new equipment are justified depends not only on present demands but on the certainty of a base which will permit the company to function in the probable lean years following this abnormal period. Appellant is committed to a long range program of modernizing its system. In approaching that problem and in justification of it, the company should know now that it will be entitled to reasonable earnings on a fair valuation of its property. Cf. *Solar Electric Co. v. Pa. P. U. C.,* 137 Pa. Superior Ct. 325, 9 A. 2d 447.

*Market Value of Securities.* The total principal amount of securities on December 31, 1941, representing funded debt, including $3,887,000 equipment trust certificates, was $62,434,848. Their market value was $46,782,895. Preferred stock (754,731 shares—par $20) was selling at $4 and common stock (719,926 shares with a stated value of $10) was selling at $1 a share. The total market value of all issues of stock and securities was $50,521,745 as against $84,728,728 par and stated values. Depressed market value is one of the considerations upon which the commission rested its conclusions. Its relevancy is based on the assumption that what the investing public is willing to pay for securities is evidence of the value of the property of the issuing corporation. Market value of securities is one of the elements to be considered, but it may be important or negligible according to the circumstances. In *Smyth v. Ames,* Mr. Justice HARLAN did not evolve

a formula for determining fair value of the property
of a utility with certainty; he did not reduce the prob-
lem to an exact science or the method to one of striking
averages. Certain indicia of value must be considered
but their relative importance depends upon the facts
of each case. Thus, market value of securities well
above their par may be evidence either that the rate of
return or the valuation upon which return is allowed,
or both, are too high. On the other hand *Smyth v.
Ames* is no authority for saying that market value, at
a fraction of face value of securities, should be further
depressed by reducing the basic adjudicated value of
the property pledged for their payment or the earnings
applicable to interest or dividends. In the present case
the market value of the securities may be evidence of
too low a valuation. More likely, the market reflects
the risks involved and the prejudice of investors against
this class of securities because of their speculative char-
acter in the light of an uncertain future. We think
market value of securities is not an element to be con-
sidered on the issues in this case and the commission
should have disregarded it.

*Book Cost.* $108,513,330 appears on appellant's books
as an opening entry of the book cost of its transporta-
tion property. This figure purports to be based on the
commission's finding of total original cost as of
October 1, 1937. We think that this book cost
and the reserve set up on appellant's books for
depreciation are to be considered but only as giving
some weight to appellant's contention that the value of
the property as adjudicated in the reorganization case
was later recognized by the commission as original cost
value for rate purposes. As required by the commission
in the order in that proceeding, there was submitted to
the commission detailed schedules of the journal entries
proposed to be used in opening the books of the re-
organized company. While it is not contended that the

figures submitted were approved by the commission, it is true that they were received and were not criticized by it. Based upon them as adjusted for property added and retired appellant set up accrued depreciation of $26,570,409 leaving a net book value of $85,153,938 on December 31, 1941. Additions of working capital and 1942 purchases of equipment increased the total book value to $92,679,031. While entitled to consideration, appellant's book costs are not of controlling importance even on the narrow issue to which their relevancy must be limited.

*Original Cost.* The company's estimate, based upon testimony of Henry E. Ehlers, Vice President of Day & Zimmerman, was $117,155,000. The commission found original cost to be $104,194,000. Both estimates are based upon actual original cost or historical cost of all items of appellant's transportation property. Despite the difference in the estimates, appellant is in substantial agreement with the commission on disputed items making up the difference, except that of franchise paving. We are in accord with appellant's position as to the capitalization of the franchise costs of paving and will state our view later in this opinion. The question is not vital here for we are of the opinion that the finding of original cost in itself, or less $47,000,000, which the commission found to be the accrued depreciation, has little bearing upon the fair value of the property on December 31, 1941. This finding is ineffective in determining value for the reason that the costs were not trended to reflect current prices of labor and materials on that date. *"Original* cost has been approved as a rate base where (1) there has been no great change in cost levels and (2) there has been a change but proper adjustment is made based upon competent evidence of price trends. See Clark's Ferry Bridge Co. v. P. S. C., 108 Pa. Superior Ct. 49, and Scranton-Spring Brook Water Service Co. v. P. S. C., 119 Pa. Superior Ct. 117,

181 A. 77": *Peoples Nat. Gas Co. v. The Pa. P. U. C.,* supra. It is idle to assume that there have not been great changes in cost levels (as well as in methods of production *reducing* unit costs) since 1857 and during subsequent years when the items of property were acquired. In the absence of adjustments of original or historical costs to determine *present* fair value as of the date in question the finding of the commission is entitled to little consideration as a determining element.

*Reproduction Cost.* Appellant submitted three estimates of reproduction cost of its useful property; two different methods were used in their computation. The commission confined its consideration to the estimate based on unit prices, independently determined by the company, as applied to the property included in the inventory. No evidence of reproduction costs was submitted by the commission or the city. "For the purpose of [its] order" the commission adopted the independently priced estimate of reproduction cost of $177,174,000 (excluding working capital and intangibles but including $15,013,000, franchise paving) adjusted only to exclude an item of indirect cost and that part of paving costs which it did not allow, leaving $162,951,000 as the total reproduction cost accepted by the commission. In adopting this estimate the commission stated: "However, in our fair value determination we will give it such weight as appears proper in the light of quality, or lack of it, of reproduction cost estimates generally and of this one in particular." The commission referred to infirmities which it ascribed to the company's computation of reproduction cost, among them: the fact that the evidence of indirect costs rests upon opinion evidence without adequate supporting data; the estimate included the reproduction cost of all of the units of appellant's property at their present locations although it was admitted, and demonstrated by the conversion program of the company, that the system would

not be reproduced in all respects in its present form. This latter criticism suggests an approach from the viewpoint of prudent investment and overlooks the fact that it has been met for the most part by an allowance for depreciation from obsolescence. The appeal of the prudent investment theory is also indicated by this statement of the commission: "it is questionable whether any weight should be given to reproduction cost in making a rate base determination." There follows in the discussion by the commission a quotation from the concurring opinion in *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U. S. 575, 62 S. Ct. 736, to the effect that the commission may entirely ignore reproduction cost as an element of *fair value.* The quotation emphasizes the statement: "The commission may now adopt if it chooses, prudent investment as a rate base."

The thorough discussion of Judge KENWORTHEY in the *Peoples Gas* case, supra, presents the reasons adopted by this court for excluding prudent investment as entering into an estimate of fair value; and his opinion together with the concurring opinion of President Judge KELLER indicates the elements which must be considered as well as those to be excluded under the law of this State in computing present fair value as a rate base. What we have said there, need not be repeated here. Reproduction cost is still an important and essential element entering into an adjudication of fair value in Pennsylvania. Moreover, we may not assume that the commission adopted $162,951,000 as reproduction cost merely because it intended to ignore it as an element of value. That amount stands as the commission's adjudication of reproduction cost of the system and there is ample evidence to support it.

*Paving.* A number of franchises granted to the street railway companies in Philadelphia required the companies, as consideration for the grants, to pave or re-

pave the streets upon which their lines were laid. Appellant is the successor of these companies and it is conceded that it inherited, by consolidation and merger, whatever rights of capitalization had accrued to predecessor companies from the performance of paving obligations under franchises from the city. In 1893 when the companies proposed to electrify their street railways the city granted supplemental franchise rights made necessary by the changed method of operation. But under the terms of the new franchises the city required them to repave certain streets upon which they operated. The work was done in 1895 and following years at an admitted cost of slightly over $15,000,000. Although the companies had been negligent in constructing and maintaining pavements under original franchises, what was required by the 1893 ordinance was not an accumulation of unfulfilled prior obligations. The paving in question was a new obligation agreed to as the consideration for supplemental franchise rights granted by the city. The cost was the amount required to be paid for the right to operate as electric street railways. The result was the same as if, instead of constructing pavements, the companies had paid the city $15,000,000 in cash.[7] The commission recognized that the repaving in question was a franchise obligation but allowed only $3,151,000 representing the

[7] In addition to these lump franchise payments, made when the transportation system was electrified, the City of Philadelphia now exacts from the company an annual payment of nine hundred thousand dollars in lieu of paving repairs, and street maintenance. This amount represents twelve million fares at the present rate, (two fares for 15 cents), or thirty-three thousand fares which the company is required to pay *daily* to the city for the privilege of operating cars on its streets.

Contrast this with the situation in New York, where that city pays out of its municipal revenues, raised by taxation on real estate, etc., about thirty-seven million dollars annually to keep the fare on its street cars and subways down to five cents, instead of a fare commensurate with its cost.

construction cost of such pavements only as were still in existence on December 31, 1941. The pavements became parts of the streets owned by the city and, when once laid, the company had no title to them. It is therefore unimportant whether any of the pavements survived to the date when the commission valued appellant's property. Appellant's claim does not rest upon the value of *property* but on the outlay in dollars spent to acquire the right to operate. Capitalization of the amount so paid for franchise paving, and the duty on the commission to include that amount in its adjudication of fair value is not open to question. *Phila. et al. v. Pub. Ser. Com.*, 83 Pa. Superior Ct. 8. Appellant claims an allowance of $7,500,000—about one-half of the total cost. As the company, the city and the commission all agreed upon a total cost of $7,500,000 for the purpose of reorganization we will limit the allowance to the reduced amount of appellant's claim. There must be included in the base, the additional sum of $4,349,000, being the difference between $7,500,000 claimed, and the amount allowed.

*Accrued Depreciation.* The commission computed accrued depreciation on reproduction cost at $73,300,000. The method was "using overall ratio of accrued depreciation [$47,000,000] to original costs" as applied to $162,951,000 reproduction cost. Appellant's testimony was that accrued depreciation related to original cost was $20,524,000. The variance between the two estimates of accrued depreciation by the commission and by the company can be accounted for to a large extent by the difference in method applied by each in computing it. The commission used the age-life straight-line method in arriving at depreciation on original cost and applied the result by the above formula to the cost of reproduction. The company's expert viewed and inspected each unit of property and his appraisement of value rests upon the actual condition of the property.

From his inspection he determined depreciation from use and other causes as well as from obsolescence. The infirmity in the method of computing lives as the basis for determining accrued depreciation is referred to in the *Peoples Gas* case. It is adapted to some classes of property in the present case; as to other kinds of property the estimate so founded is wholly inaccurate. As applied to trolley cars, for example, the age-life method will result in estimates which are reasonably reliable. The useful life of a trolley car may be thirty years. By proper maintenance however, (old cars of appellant—some of them 45 years old—were modernized and rejuvenated to meet the war-time demand for transportation) the useful life of a trolley car can be extended indefinitely beyond the limit of its theoretical life though losing rider appeal through obsolescence. The same may be said of other classes of equipment. Appellant refers to items of property which the commission found valueless because of age, which were still being used and continued to be useful. Such property as could be identified in the commission's schedules had a total value of $5,653,477, based on historical costs. The age-life method is wholly misleading when applied to units of property renewed or replaced from time to time. Appellant's tracks perhaps are the best example of this class of property. In the maintenance practice adopted by appellant certain stretches of tracks were renewed each year at the expense of operation. Thus the whole track system was kept in full useful value by the elimination of parts as they deteriorated through wear and tear. Estimates based on age-life which do not take into consideration the actual condition of tracks so renewed and maintained are entitled to little weight. Perhaps appellant's estimate of depreciation of its tracks at an overall rate of 14.7% on original cost is too low. It included in the estimate 80% of the cost of 82 miles of track about to be abandoned; it depreciated other

sections of track according to their condition by amounts which may understate depreciation; and the low depreciated value may be uncompensated by the item included as the cost of "deferred renewals." But in any view the sum of $2,721,000, in our opinion, is nearer the true accrued depreciation of tracks than the much higher depreciation found by the commission by application of the age-life method.

In the present case the actual amount of accrued depreciation is somewhere between the two estimates. But if we accept reproduction cost as adopted by the commission and its estimate of accrued depreciation, in the commission's own figures we find support for our conclusion as to the net fair value of appellant's transportation property. The commission found reproduction cost less depreciation to be $89,651,000 ($162,951,000 less $73,-300,000). Additional allowed items of working capital, cost of financing and 1942 purchases of new equipment increased the total to $98,276,000.

*Rate of Return.* The commission allowed 6%; appellant contends for an allowance of 7%. Each utility presents an individual problem. *United Rys. & Electric Co. of Baltimore v. West,* 280 U. S. 234, 249, 50 S. Ct. 123. The only opinion evidence on the subject is the testimony of Edward Hopkinson Jr., director of appellant company, who had acted as reorganization manager of the former Transit Company and its underliers under appointment by the district court; and the testimony of Paul B. Coffman, Vice President of Standard & Poor's Corporation, a financial statistical service of New York. That these witnesses are well qualified, is conceded. Indicating his approach to the question, Coffman stated that what he was principally interested in "was the matter of preservation of *investment quality* of debt outstanding." (Italics added). We agree with the commission that in his testimony his endeavor was not to preserve but to *improve* the quality of the debt

outstanding in its investment appeal. Desirable as that may be (particularly since much of the stock of the company is owned by its employees) it is not for the commission or for us to establish or maintain investment quality of securities wholly in the interests of investors. We are concerned with rate of return, also, as it affects the ability of the company to serve the public, and we are not impressed by the argument that by reinstating confidence in appellant's securities, future "equity" issues, subject to underlying securities, may be sold providing funds for capital expenditures. It is doubtful that 7% would work that result or that raising capital by that method will be either necessary or desirable. Efficient operation with the means at hand would seem to be the way for appellant to improve its status. We agree with Mr. Hopkinson that "the rate of return is a matter of public and consumer interest ...... to insure, in good times and bad, the ability of a public utility, which has a duty to serve the public, to have sufficient credit and cash to enable it to fulfill those duties." As suggested by him, appellant is not in the same class as, e. g., water companies or electric utilities whose business is stable and whose earnings in the present are reliable forecasts of earnings for the future. In contrast with utilities of that type, appellant's chances for the future are speculative; the demand for its services cannot be charted with any degree of confidence. No one can predict the conditions affecting appellant's ability to earn in the post war period. Against these uncertainties it should be entitled to a somewhat higher rate of return. "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too

high or too low by changes affecting opportunities for investment, the money market and business conditions generally": *Bluefield Water Works & I. Co. v. Public Service Commission*, 262 U. S. 679, 692, 43 S. Ct. 675. Moreover in the long run the company will survive only if it can meet competition by providing the most modern equipment available. The purchase of 748 new trolley cars, trackless trolleys and motor busses, at a cost of nearly $10,000,000, was made possible by the sale of Equipment Trust obligations. More equipment will be bought in the future by the same method. The uncertainties of the future also suggest the wisdom of accumulating a substantial surplus from earnings to meet periods of low transportation demands. For these purposes and because of the degree of the risk, we are of the opinion that a rate of 6½% should be allowed as a reasonable return on a fair valuation.[8]

*Cash Working Capital.* Appellant claimed $2,700,000; the commission allowed but $1,000,000. True, all of the company's earnings are on a cash basis. The amount allowed by the commission, with additions from day by day earnings in all probability will be sufficient to meet current payrolls, the cost of supplies, materials, power and other normal operating costs. But the commission's allowance does not take into consideration unusual demands upon working capital which probably will occur from time to time in the transformation of

[8] In *Federal Power Commission et al. v. Hope Natural Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 6½% was approved as a fair rate of return in the light of the risks assumed. The business there was speculative because of the uncertainty of an available supply of natural gas; here the future uncertainty is the public demand for transportation. The allowance by the commission of a return of 6½% in *Peoples Nat. Gas Co. v. Pa. P. U. C.*, involving the same risks as in the *Hope* case, was approved by us in 153 Pa. Superior Ct. 475, 34 A. 2d 375. Cf. *Solar Electric Co. v. P. U. C.*, supra, p. 387; and discussion in *United Rys. & Electric Co. of Baltimore v. West*, supra.

the company's system, as well as from other unforseeable causes. Our first impression was that the claim of appellant is excessive. On considering the foundations for the claim particularly the scope of appellant's operations and the fact that $2,700,000 is no more than the total of one month's operating expense we believe an allowance in that amount is reasonable.

## CONCLUSIONS

The fair value of appellant's transportation property on December 31, 1941, was about $87,000,000. We will adopt a lesser figure, $86,951,000, as total value including $3,325,093 for equipment added in 1942. To this sum will be added $1,700,000 additional cash working capital and $4,349,000 franchise paving costs, increasing the total to $93,000,000.[9]

Appellant is entitled to a return on that amount at the rate of 6½% per annum.

The orders of the commission are modified to conform with this opinion and the above conclusions; each

---

[9] If we start with $77,000,000 as the commission's adjudication of value, an addition of at least $10,000,000, in view of the total of reproduction costs adopted by the commission, would appear to be reasonable; whether accrued depreciation be deducted from that cost in the amount found by the commission or the figure contended for by appellant. Additional cash working capital allowed by us and franchise paving increase the total to $93,049,000.

We have referred to the emphasis which appellant has placed upon the adjudication of $85,000,000 as total value in the reorganization case. Following reorganization, by agreement, an option was given the city to buy the entire transportation system at about that figure as adjusted by later additions and retirements. In that agreement between a willing seller and a prospective buyer there is some evidence that the city, an appellee here, as well as the appellant, considered $85,000,000 as approximating the then fair value of the property. Thus each of the three parties to this appeal has adopted $85,000,000 as the value of appellant's property at the time of reorganization. If we add $10,000,000—the cost of equipment bought later, adjusted for property retired—we have additional support for our conclusion.

party to pay the cost of printing its brief; the cost of printing the record to be borne equally by appellant and the commission.

DISSENTING OPINION BY RHODES, J.:

In these appeals the controversy relates primarily to the fair value of appellant's property and the allowable rate of return. Operating expenses, rentals, taxes, and annual depreciation as determined by the commission are accepted by appellant.

I am unable to agree with the principles set forth or with the independent findings in the majority opinion. Present fair value is to be determined by the reproduction cost theory,[1] because by process of elimination no other element remains. To so construe present fair value is to defeat the very purpose of commission regulation (see *Metropolitan Edison Co. v. P. S. C. et al.*, 127 Pa. Superior Ct., 11, 20, 191 A. 678), and it invites ultimate public ownership of utilities. There is no legislative mandate—and neither reasonable statutory construction nor judicial interpretation warrants the conclusion—that fair value is to be determined by such a single element. See *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U. S. 575, 586, 86 L. Ed. 1037, 1049. Although section 311 of the Act of May 28, 1937, P. L. 1053, 66 PS §1151, provides that "The commission

---

[1] Mr. Justice STONE (now Mr. Chief Justice) in his dissenting opinion in *West v. Chesapeake & Potomac Telephone Company*, 295 U. S. 662, 689, 79 L. Ed. 1640, 1656, said: "In assuming the task of determining judicially the present fair replacement value of the vast properties of public utilities, courts have been projected into the most speculative undertaking imposed upon them in the entire history of English jurisprudence ...... Public utility properties are not thus created full fledged at a single stroke. If it were to be presently rebuilt in its entirety, in all probability it would not be constructed in its present form. When we arrive at a theoretical value based upon such uncertain and fugitive data we gain at best only an illusory certainty."

may ...... ascertain and fix the fair value ...... of the property of any public utility, in so far as the same is material to the exercise of the jurisdiction of the commission," section 301 of the same act, as amended, 66 PS §1141, prescribes that "Every rate made, demanded, or received by any public utility, ...... shall be just and reasonable, and in conformity with regulations or orders of the commission ......" It is sufficiently evident that a fair return on an inflated and excessive valuation precludes the establishment of just and reasonable rates.[2]

The commission found the fair value of appellant's property, used and useful in the public service, to be $77,000,000. This amount includes working capital $2,500,000, cost of financing $2,800,000, and the estimated cost of new equipment which was to be purchased in 1942, $3,325,000. There was an allowance of 6 per cent for rate of return.

The result was the allowance of operating revenues computed as follows:

| | |
|---|---|
| 6% Return on Fair Value of $77,000,000 | $4,620,000 |
| Operating Expenses .................. | 28,281,100 |
| Rentals ........................... | 2,538,600 |
| Taxes ............................ | 3,334,300 |
| Annual Depreciation ............... | 3,200,000 |
| | |
| Allowable Operating Revenues ........ | $41,974,000 |

[2] "Rate-making is indeed but one species of price-fixing. *Munn v. Illinois,* 94 US 113, 134, 24 L. ed. 77, 87. The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. *Block v. Hirsh,* 256 US 135, 155-157, 65 L. ed. 865, 870, 871, 41 S. Ct. 458, 16 ALR 165; *Nebbia v. New York,* 291 US 502, 523-539, 78 L. ed. 940, 948, 958, 54 S. Ct. 505, 89 ALR 1469, and cases cited. It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates

Appellant suggests that the fair value of its property cannot properly be less than $110,000,000, and that the rate of return should be 7 per cent.

This case arises out of the action of appellant in filing two new tariffs which were to become effective on January 15, 1942. Their operation was suspended by the commission. Before their effective date complaint was filed against them by the City of Philadelphia. Consolidation was allowed for the purpose of hearing only. The rates and charges set forth in the new schedules were canceled and the rates and charges set forth in the previous schedules were directed to be reestablished. The same order was made applicable in both proceedings. These appeals by appellant are from that order.

Appellant, Philadelphia Transportation Company, began business on January 1, 1940, and was the result of the reorganization of the Philadelphia Rapid Transit Company. Formation of the present appellant company was pursuant to a plan of reorganization proposed in proceedings in the United States District Court for the Eastern District of Pennsylvania commenced on October 1, 1934, under section 77(b) of the National Bankruptcy Act. Before confirmation approval by the Pennsylvania Public Utility Commission was required. Hearings were held on the application, and the commission eventually approved the final plan of reorganization calling for a total of capital securities to be issued and assumed of approximately $85,000,000. The first plan of reorganization contemplated the issuance of capital securities to the extent of $174,000,000. The plan finally approved by the commission on November 22, 1938, provided for the issuance of capital securities

cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated": *Federal Power Commission v. Hope Natural Gas Co.,* 320 U. S. 591, 88 L. Ed. 276, 282.

in the present amount. The City of Philadelphia gave its approval.[3]

Appellant argues to the effect that the commission in the reorganization proceedings, having approved the issuance of approximately $85,000,000 of securities, was bound to find a fair value of appellant's property of at least the amount of the securities issued plus an allowance for materials and supplies, working capital, and the additions made during 1942. Appellant in its brief presents its contention as follows: "...... that the same used and useful property of a Pennsylvania public utility cannot contemporaneously have one value in dollars for the purpose of supporting an aggregate amount of securities to be presently assumed and issued against such property and a lower fair value as the measure of the constitutional protection to which the holders of those securities are entitled in a rate case." The majority opinion says: "Certainly the finding of $85,000,000 for a specific purpose is not res adjudicata here. The commission stated and appellant agreed that the value found should not be binding in any other proceeding or for any other purpose." But the majority opinion goes on to say: "But in the absence of a rational basis for a change of position, the finding as it stands is evidence of the fair value of the property in 1941."[4]

In the several orders of the commission in connection with the reorganization proceedings it was made clear that the commission had no intention of determining the fair value or establishing a rate base for rate making

---

[3] The city under its option may purchase all of appellant's property for about $85,000,000 with adjustments.

[4] "Moreover the commission approved a valuation of $85,000,000 wholly upon its finding of original cost depreciated, including cash and net assets other than fixed property. ...... The finding [original cost depreciated] is ineffective in determining value for the reason that the costs were not trended to reflect current prices of labor and materials on that date [Dec. 31, 1941.]." Majority opinion pages 17 & 21.

purposes. For instance, the commission there said:

"Approval by the Commission of any security issue does not imply a guaranty that unjustifiably high rates will be approved in order that these securities may be serviced."

"This report and order should not be construed as requiring the Commission in any proceeding brought before it under the Public Utility Law of the Commonwealth of Pennsylvania for any purpose to fix a valuation which shall be equal to the total of the securities proposed under the applicant's plan, or to approve or prescribe a rate which shall be sufficient to yield a return on said securities." See Public Utility Law of May 28, 1937, P. L. 1053, §§603, 918, 66 PS §§1243, 1368.

In its order of October 3, 1938, in the reorganization proceedings, the commission recommended a capitalization comprising security issues in an amount approximating $75,000,000. In that order the commission said: "We do not now determine the fair value of the property to be acquired for any purpose other than to consider whether the proposed Plan of Reorganization should be approved. For such purpose the fair value of the physical assets is $105,419,769, less accrued depreciation of $31,000,000 as of October 1, 1937."[5] It may

---

[5] "On October 3, 1938, the Commission issued an order disapproving the plan of reorganization then under review. On November 17, 1938, a petition for reconsideration was filed and on November 22, 1938, an order was issued granting approval. In the petition for reconsideration, Philadelphia Rapid Transit Company, applicant, suggested certain adjustments in the accounts, to the end that a total capitalization of $85,000,000 would result, instead of the capitalization of $99,000,000 which was disapproved in the order of October 3, 1938. Without passing specifically upon each adjustment suggested, approval was granted in the order of November 22, 1938. It should be noted, however, that in the order of October 3, 1938, the Commission made a determination of the value of respondent's physical assets depreciated in the

be said, as pointed out by the commission, that the difference between the $75,000,000 of securities recommended by the commission and the amount that was finally issued of $85,000,000 is largely a result of appellant's adherence to placing an arbitrary par value of $20 per share on an issue of preferred stock and a stated value of $10 per share on the issue of common stock. In this connection the commission said: "It is a matter of common knowledge that par or stated values of common stock do not fix the actual investment of a holder in a company whose stock he holds."

"The fiction of giving a [$10] stated value to the common stock of the proposed company, cannot give real value to nonexistent equities." Order nisi, October 3, 1938.

The equity represented by preferred and common stock is variable, and there is no reason to believe that the commission indicated that the respective shares had an actual value equivalent to the par or stated value. The commission, in its order nisi, in the present proceedings, said:

"It should be emphasized at this point that the plan of reorganization as finally approved was primarily a compromise between many divergent interests. The reorganization proceedings were begun in 1934, but the plan of reorganization proposed at that time, and various others formulated thereafter, were not acceptable to all the interested parties. The plan as approved involved the merger of Philadelphia Rapid Transit Company and sixty-four so-called underliers, many of which had outstanding stocks, stock trust certifi-

amount of $73,442,769, excluding property not used or useful and the Willow Grove Park property. If we add thereto our allowance in this case for working capital and materials and supplies in the aggregate amount of $2,500,000, a total of $75,942,769 is derived. The order of November 22, 1938, did not alter the value found in the preceding order, nor was any indication given that it should be altered." Final Order of October 13, 1942.

cates, collateral bonds, and mortgage bonds, in the hands of the public, and the holders of each group of such securities had to be reckoned with before the plan could become operative. ...... The Commission's approval, therefore, should not be construed as ratification of various values involved in the reorganization proceedings, but rather as a frank recognition that the public interest could be best served by acquiescing in a plan which, with one exception, had the approval of all groups, and thus open the way for normal operations after four years of contention, litigation and bankruptcy."

Appellant is for present purposes a new corporation which has acquired its assets from many independent sources, and issued securities therefor. Its present fair value would seem to be the principal issue, although largely academic, and this, in my judgment, does not involve much that transpired prior to the reorganization which created appellant company. It is conceded that the total amount of securities did not represent an adjudicated value which the commission was thereafter bound to find as a minimum fair value of appellant's used and useful property. In my opinion, the reorganization proceedings are under the circumstances in no way material, or controlling of the present proceedings. The reorganization proceedings were the result of applicant's inability to meet dividend and interest requirements. I think ordinarily the valuation for reorganization should not be disturbed for a reasonable period. But a new capitalization that continued the original situation in any degree would be unjustified. The commission's approval in the manner made may have been ill advised, and thus productive of the results which have followed. "The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn": *Institutional Investors v. Chicago, M. St. P. & P.,* 318 U. S. 523, 540,

87 L. Ed. 959, 994. In *Consolidated Rock Products Co. v. Du Bois,* 312 U. S. 510, 525, 85 L. Ed. 982, it was said: "Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a sine qua non to a determination of the integrity and practicability of the new capital structure."

## RATE BASE

The commission in determining the fair value of appellant's used and useful property considered the following elements: Original cost depreciated, reproduction cost depreciated, book cost less depreciation reserve as adjusted, and the par or stated value and the market value of the securities. See *Smyth v. Ames,* 169 U. S. 466, 42 L. Ed. 819; *Solar Electric Co. v. Pa. P. U. C. et al.,* 137 Pa. Superior Ct. 325, 347, 9 A. 2d 447. All of the elements as found by the commission may be summarized as follows (56a):

| | |
|---|---|
| Original Cost Depreciated ........... | $65,819,000 |
| Reproduction Cost Depreciated ...... | 98,276,000 |
| Book Cost less depreciation reserve, as adjusted ........................ | 82,749,000 |
| Bonds, stock and surplus: | |
| At par and stated values .......... | 87,569,000 |
| At market values ................. | 52,522,000 |

The commission said that upon consideration of these elements and all other facts of record which might be considered as relevant thereto it found and determined that the fair value of appellant's used and useful property as a going concern based on evidence as of December 31, 1941, was $77,000,000, including working capital, cost of financing, and the estimated cost of equipment to be purchased in 1942.

I think the finding of the commission in this respect represents a reasonable appraisal of the evidence. The result, if material, does not indicate confiscation, unfairness, or unreasonableness. The nature of appel-

lant's business would not warrant a present fair value approximating depreciated reproduction cost. Obsolescence is a material factor. There has been a marked change in the past in transportation methods, and the evolutionary process is not complete. "Reproduction cost as the cost of building a replica of an obsolescent plant is not of real significance."

There may be some merit in criticising the market value of securities as an important, although relevant, element in the determination of fair value. The commission in its final order as to this said: "Securities were considered with the other elements but were not given predominant weight, either as to their par or stated value or as to their market value." But in contrast to the reproduction cost theory of the majority, appellant submits that investment valuation, original cost undepreciated, original cost depreciated, and reproduction cost depreciated are the principal indices [6] of fair value from the consideration of which the judgment figure of fair value should have been determined by the commission.

One of the principal contentions of appellant is that original cost less accrued depreciation was the basis of the commission's action in the reorganization proceedings and was determined in the order of October 3,

---

[6] Appellant's brief (p. 132) shows in parallel columns the elements set forth by the commission in the order nisi (56a), and the elements which appellant asserts must under the law and the evidence be considered:

|  | Order Nisi | Appellant's Contentions |
|---|---|---|
| "Original Cost, Undepreciated .. | (not considered) | $127,480,573 |
| Original Cost Depreciated ..... | $65,819,000 | 100,910,164 |
| Reproduction Cost Depreciated | 98,276,000 | 144,299,093 |
| Book Cost less depreciation reserve, as adjusted .......... | 82,749,000 | 92,679,031 |
| Bonds, stock and surplus: |  |  |
| At par and stated values .. | 87,569,000 | 91,284,784 |
| At market values ........ | 52,522,000 | (not relevant)" |

40

1938, to be $70,642,769 [$74,419,769 less $2,800,000 cost of financing, and $977,000 for Willow Grove Park], and that, with more and better [7] physical property today, the original cost less accrued depreciation cannot now be only $57,194,000. This difference is principally in the depreciation item. In the commission's order of October 3, 1938, in the reorganization proceedings, the commission considered the total physical assets undepreciated of the value of $105,419,769 less accrued depreciation of $31,000,000; this made the depreciated assets $74,419,769. In the present proceedings the commission determined the original cost of appellant's property to be $104,194,000 as of December 31, 1941. This less accrued depreciation of $47,000,000 made the original cost less accrued depreciation $57,194,000. To this sum is added working capital $2,500,000, cost of financing $2,800,000, and cost of new equipment to be purchased in 1942, $3,325,000, or a total of $65,819,000. If to the commission's finding of fair value of $77,000,000 is added the depreciation difference of $16,000,000 we have a figure of $93,000,000, which approximates the

---

[7] In the dissenting opinion of Commissioner Buchanan, the following comment appears (167a):

"The company contends that it has now 'more and better' property than in 1938 meaning, of course, the new street cars, trolley buses and motor buses, and therefore, it argues, an increased valuation over the 1938 figure is proper. But under the equipment obligations it does not hold title to a single wheel or unit of any of the new equipment, the credit of the company was not required to obtain it, and therefore it has no capitalizable rights in the new rolling stock whatsoever. Its interest is merely a lease arrangement with the rentals chargeable to operating expense and the vehicles thereby becoming fully depreciated if and when title is acquired. Likewise the 'more and better' equipment includes some 400 or more street railway cars (the record is somewhat confused as to the number) restored to service from storage (fully depreciated) which the requirements of war transportation have demanded."

figure of $92,679,031,[8] which appellant contends is the index of minimum fair value of its property in the light of the reorganization proceedings and in conformity with the principle laid down by the commission in *Peoples Natural Gas Co. v. Pa. P. U. C.*, 153 Pa. Superior Ct. 475, 34 A. 2d 375. In the *Peoples Natural Gas Company* case the commission merely said that the investment was an "important index of the minimum fair value." This court, in reversing the commission (153 Pa. Superior Ct. 475, 486, 34 A. 2d 375), said, in effect, that invested capital found as representing Peoples' capitalization bore no direct relationship to value.

It seems to me that any upward adjustment of the rate base from that found by the commission depends largely upon three disputed matters, to wit, paving, accrued depreciation, and working cash capital.

## PAVING

Appellant claims an allowance of approximately $15,000,000 for paving. On its books as of January 1, 1940 (and in the item of transportation property in statement in footnote 8) paving is carried in the amount of $7,498,150. Undoubtedly much paving was installed in accordance with franchise requirements by appellant's predecessors, but I am unable to see how this

---

[8] Appellant makes up this amount as follows:

| | |
|---|---:|
| Transportation Property at 12/31/41 | $111,724,347 |
| Less accrued depreciation Transportation property 12/31/41 | 26,570,409 |
| | $ 85,153,938 |
| Add: | |
| Working Capital, Materials and Supplies | 1,500,000 |
| Working Capital, Cash | 2,700,000 |
| 1942 Equipment Purchases | 3,325,093 |
| | $ 92,679,031 |

factor enters into the present fair value. A history of this expenditure indicates to me that it is not even a factor at the present time. However, the commission has allowed the value of the paving as of the time of the commission's determination of fair value in this proceeding. This amount, $3,151,000, represents the total paving laid by appellant and its predecessors, as is still in existence. I think this is the maximum allowance that should be made. It does not appear that any capital funds of appellant or its predecessors have been expended for paving maintenance or repairing since 1907. The cost of paving has been merged into an annual payment under the agreement of 1907 beginning with $500,000 and increasing $50,000 every ten years until it has reached the sum of $650,000. The items claimed as part of fair value consist principally of money spent for paving prior to 1907. (Under the ninth paragraph of the agreement of 1907 the commission has also allowed the city $300,000 per annum.) The commission in its order nisi (25a) aptly said: "There can be no justification for requiring the rate-payer to pay an annual charge imposed on the company in full satisfaction of a previous obligation and at the same time require payment of a return on the prior investment in that obligation." If appellant had paid $50,-000,000 for franchise rights years ago, I do not think any one would contend that such sum must necessarily be included in fair value today. Present fair value is not to be determined on any theory of estoppel.

## ACCRUED DEPRECIATION

Appellant contends with respect to accrued depreciation that the findings of the commission in the reorganization proceedings relative thereto are binding in this case, as the question of depreciation has there been determined and cannot be disturbed by different findings in the present proceedings. In the reorganization proceedings the accrued depreciation was fixed at $31,-

000,000, while in the present proceedings it was fixed at $47,000,000 on property having an original cost as asserted by the commission of $104,194,000. Without entering into a detailed discussion and assuming that the commission was not bound by the finding in the reorganization proceedings, I think depreciation in the amount of $47,000,000 is not unreasonable when you consider the type of property involved. The commission used a straight line age-life method in computing the depreciation, and I think the record upon examination supports the commission's view. Under the circumstances (see order nisi 33a—46a) the use of the straight line age-life method was proper. In the reorganization proceedings the commission accepted one of applicant's estimates of accrued depreciation (found to be $30,-395,000) which used the lives of the property as estimated by the commission's staff and assumed a return of 4 per cent on the investment of the sums set aside as depreciation reserve. In fixing the amount of $31,-000,000 the commission said: "We do not accept this method of determining accrued depreciation as proper, and the result reached in this case is not to be considered a precedent therefor. Nevertheless, the sum represents one estimate of accrued depreciation in the record and approaches an average between the estimate of the Commission staff and applicant's estimated reserve requirement." In that proceeding there was testimony offered by the commission that the accrued depreciation based on the straight line age-life method amounted to $48,000,000. The commission now contends that appellant "in taking the position that the measure of accrued depreciation is foreclosed because of the reorganization proceeding, makes no distinction between actual depreciation accrued and depreciation reserve."

It is the commission's position that the figure urged by appellant in the reorganization proceeding was

simply an estimate of depreciation reserve determined by the application of 4 per cent sinking fund method to the ages and lives as used by the commission's engineers in determination of accrued depreciation of $48,000,000 by the straight line method. As to depreciation, see *Lindheimer v. Illinois Bell Telephone Co.*, 292 U. S. 151, 173, 54 S. Ct. 658, 78 L. Ed. 1182, 1196; *Federal Power Commission v. Natural Gas Pipeline Co.*, supra, 315 U. S. 575, 86 L. Ed. 1037; *Federal Power Commission v. Hope Natural Gas Co.*, 320 U. S. 591, 88 L. Ed. 276.

## WORKING CAPITAL

Appellant claims $2,700,000 as working cash capital. The commission allowed $1,000,000. There was also allowed $1,500,000 for material and supplies. I think the allowance provides an adequate margin of safety.

## RATE OF RETURN

Appellant's position is that it is entitled to a return of 7 per cent. The commission's finding of a return of 6 per cent is supported by the record and is not confiscatory. I find no reason to disturb the finding. See *Peoples Natural Gas Co. v. Pa. P. U. C.*, supra, 153 Pa. Superior Ct. 475, 494, 34 A. 2d 375.

## PRESENT RATES

The commission found that appellant's present rates are reasonable, and that its proposed rates were unreasonable, and would yield an excessive income (see order nisi, 92a, and final order, 152a). This court has said that while the Act of May 28, 1937, P. L. 1053, §311, 66 PS §1151, authorizes the commission to find fair value of the property of a public utility, it does not require such finding except where the commission finds the rates of the utility to be unjust and unreasonable. *Perkasie Sewer Co. v. Pa. P. U. C.*, 142 Pa. Superior Ct. 262, 16 A. 2d 158. As to valuation, see, also, *City of Philadelphia et al. v. P. S. C.*, 83 Pa. Superior Ct. 8, 11, 12; *New Street Bridge Co. v. P. S. C.*, 271 Pa. 19,

38, 114 A. 378. But it does not appear that a determination of present fair value of appellant's property was a prerequisite to the finding as to rates in the present case. In the course of the hearings before the commission, as stated in the majority opinion, "it developed that higher fares were not necessary because of increases in earnings after the tariffs were filed." The question of value was, under the circumstances, subordinate to the finding that the present rates are fair and reasonable. The majority opinion does not disturb the existing schedule of charges; whether higher fares may be necessary at some time in the future will depend on future events. I question the advisability of adopting a rate base under these conditions. With the approval of the present rates the question of value could very well have been held in abeyance. But this court, in the majority opinion, has added $16,000,000 to the finding of the commission, making the rate base $93,-000,000 with a return thereon at 6½ per cent per annum. (A public statement by appellant estimated that approximately 1,125,000,000 passengers would be carried during 1943. This is 158,500,000 higher than the previous record established in 1926, and 67 per cent higher than the number carried in 1940.) A rate base which may only be used at some future time, if at all, for a change in rates, and which is the result of spot reproduction cost estimates is an anomaly.

The factual determinations of the commission are in conformity with present legal standards.