## In re Moneys Held by Philadelphia Transportation Company

*A. J. Creskoff*, for petitioner.

*Roy N. Freed*, for respondent.

*Michael Edelman*, for intervenor.

REIMEL, J., January 8, 1963.—The Attorney General of Pennsylvania, on August 1, 1958, filed a petition in escheat against the respondent, Philadelphia Transportation Company (PTC hereafter), for the escheat of certain moneys held and owing by respondent. Respondent owns and operates subways and elevated systems in the City of Philadelphia. These subways and elevated systems were constructed and maintained by various contractors and subcontractors. When the PTC commenced its maintenance of these systems, it found that the contractors had left in the Fern Rock Station of the Broad Street Subway various items of property used for the operation and maintenance of the subway system which were worth $33,759.32. Respondent used these properties in the operation and maintenance of the subway system.

In respondent's answer and new matter, respondent asserted that these items had been abandoned by the contractors and that respondent had, by inventorying and consuming the property in its normal operations,

become the owner of this property. By stipulation of counsel and order of the court, the City of Philadelphia (city hereafter) was permitted to intervene as a party respondent. The city denied the PTC's claim of ownership of the property in question. Under new matter, the city alleged that it constructed and owns the Broad Street Subway, that such system is leased to PTC, and that the property in question, consisting of construction materials and spare parts, had been purchased by the city. The PTC then admitted all the averments of the city's new matter. Therefore, this court need not consider the PTC's original contention that it became the owner of the property in question by consuming it.

The PTC and the city contend that an examination of the testimony elicited in another case (Philadelphia Transportation Co. v. Pennsylvania Public Utility Commission, 155 Pa. Superior Ct. 9 (1944)), will show that, as between the PTC and the city, the PTC acknowledged that it is indebted to the city for the use of these items, and that the city recognizes that the PTC is so indebted. This court, however, cannot consider that testimony because petitioner in this case has not had the opportunity to cross examine the witnesses in that case.

The PTC and the city further contend that this court should consider, by means of judicial notice, the lease agreement between the PTC and the city. Since this lease agreement is founded upon the Ordinances of City Council dated June 26, 1934, and May 30, 1939, this court can judicially notice this lease agreement. This lease agreement provides in paragraph 15 that the city shall file an inventory with the PTC of property delivered to the PTC, and that the PTC shall, at the expiration of the lease, return to the city this property. If the property is consumed, the PTC may be liable to the city for this property, but this court need not decide that question.

But what is in issue is whether the city was the owner of this property at the time the PTC assumed maintenance of the subway system. If the city was, at that time, the owner, then it still is the owner. Therefore, there can be no question of abandonment as the owner of the property is known. Consequently, there would be no escheat possible. All rights to the property would rest in the city.

The question at issue is whether the city or the contractors were the owners of the property when the PTC assumed maintenance of the subway system. If the contractors were the owners, then the property or the payment for the property would escheat to petitioner. This would necessarily follow because the PTC no longer contends that if the property was owned by the contractors it had asserted ownership to the property after the contractors abandoned it, but it claims only that the city owned the property, and, if this court finds that the city did not own the property, then the PTC has no claim based upon its right of assumptive ownership.

The PTC agreed to a statement read into the record by petitioner that asserted "various materials located at the Fern Rock Station were left behind by the contractors and sub-contractors." This does not establish that this property was not owned by the city. In the statement to the court, agreed to by PTC, it is asserted that the contractors left this property. The implication of the testimony and the statement to the court and the stipulation of the facts is that the PTC was agreeing that the property was owned by the contractors. This is in keeping with the PTC's original contention that the property was abandoned by the contractors and that it acquired ownership of the property by consuming it. However, there is the intervening respondent to consider.

The city entered the case subsequent to the taking of testimony. The city does not agree that the contractors

were the owners; it asserts that it is the owner. It asserts this as new matter.

The basic issue, then, is whether the city has established to the satisfaction of this court that it is the owner of the items left in the Fern Rock Station by the contractors. The rule is quite clear that the city has the burden of proving its ownership:

"The Commonwealth's claim of escheat, or the right to take possession in lieu thereof—without escheat—is predicated on the existence of ownerless and unclaimed property or funds. Where the existence of such property or funds is admitted by the one in possession, the Commonwealth's right thereto follows without further proof. The burden is then on the person denying the Commonwealth's right to establish, by proof or otherwise, why the Commonwealth is not entitled thereto": Lamberton's Estate, 51 D. & C. 318, 321 (1944).

Because of the great interval of time between the date of this action and the original activity upon which this action is based, and the consequences of this long interval, such as the loss of witnesses and the destruction of documents, the city is unable to prove the original agreement between the city and the contractors in regard to these items.

Petitioner admits in its reply to new matter of City of Philadelphia that the city owns the Broad Street Subway and the Fern Rock Station. The crucial issue, therefore, is whether the city's ownership of the Fern Rock Station would imply that the city also owned the items remaining in the station when the contractors ceased maintaining the subway system.

The more reasonable of the two alternatives, that the contractors or the city was the owner of this property, is that the city was the owner of this property. The items involved are listed in the last page of respondent's answer to petition in escheat. The following items are listed: (1) Rails; (2) rail fastenings; (3) special

work; (4) castings and forgings; (5) wire and cable; (6) line accessories; (7) track bonds; (8) signal and telephone parts; (9) couplers and journal boxes; (10) metals; (11) truck parts; (12) bearings; (13) motor parts; (14) controllers; (15) contractors, reversors and relays; (16) fuse boxes, resistance, etc.; (17) airbrake materials; (18) door and step control devices; (19) heaters; (20) car trimmings; (21) electrical supplies.

If the property in this case was tools, such as hammers and shovels, which were used to construct the subway system, it would be reasonable to conclude that the contractor was the owner. Just like spare parts in a repair shop that will be used to repair articles brought to the repair shop by customers, these items would not be considered fixtures and, therefore, be regarded as the property of the party who owned the land upon which they are found.

At the opposite extreme, we have interchangeable parts for a machine that is a fixture. These would be considered to be fixtures and would be the property of the owner of the land upon which the machine and interchangeable parts are found. It has been held that rolls used in an iron mill to manufacture bars of different shapes and sizes even though only one of them is fixed in place, and despite the fact that no two are used at the same time, all are fixtures and, therefore, belong to the owner of the land. See Voorhis v. Freeman, 2 W. & S. 116, 37 Am. Dec. 490 (1841). The English courts have reached the same conclusion: Ex Parte Astbury, L. R. 4 Ch. App. 630 (1869).

Intermediate between these two end categories are items that are not used interchangeably with one part that is at the present time within the machine but are used as replacements for a part of the machine when that part is no longer usable. These are not similar to the spare parts kept in a repair shop which can be used

to repair any of a great number of machines brought to the repair shop. In other words, these are not standard spare parts. Instead, these are spare parts that are used to replace parts in a specific machine, are designed and fitted for that particular machine, are intended to be used to repair that machine, and are stored reasonably close to that machine so that they can be installed without great delay. Such is the character of the parts left by the contractor in the instant case. These are not parts for a machine, however, but they are parts for a system, a subway system, and it is the conclusion of this court that the natural assumption would be that the owner of the subway system also owned the spare parts designed and stored for the replacement of actual parts of the system.

The Supreme Court has established the following rule:

"Some two or three of these rolls, however, were duplicates; but all of them had, at one time or another, been in actual operation, and it is impossible to say which were the proper members of the set, and which the supernumeraries. But even if that could be told, all might nevertheless be deemed a part of the mill, seeing that they are often broken and cannot be instantly replaced if they are not kept ready on hand. Duplicates necessary and proper for an emergency, consequently follow the realty on the principle by which duplicate keys of a banking-house or the toll-dishes of a mill, follow it": Voorhis v. Freeman, 2 W. & S. 116, 120, 37 Am. Dec. 490 (1841).

Similarly, the Supreme Court of Michigan declared that "spare motors, parts, machinery, equipment, etc., which constitute replacements specially adapted to the full enjoyment of the realty" are fixtures: Detroit Trust Co. v. Detroit City Service Co., 262 Mich. 14, 247 N. W. 76, 81 (1933). Finally, storm doors and windows stored in a stable on the premises until the winter have

also been regarded as fixtures: Roderick v. Sanborn, 106 Me. 159, 76 Atl. 263 (1909). See also 22 Am. Jur., Explosions and Explosives, §72.

This property is, for the most part, spare parts that were intended to be used to keep the subway system in a state of constant repair, and were, in fact, so used. These items are spare parts for the system. These spare parts are part of the subway system itself. Such property was of small value to the contractor once its obligation to maintain the system had terminated. Therefore, ownership of the system would seem to include ownership of these spare parts.

It is the finding of this court that the property remaining at the Fern Rock Station was owned by the intervening respondent, the City of Philadelphia, and therefore, this property or the payment for this property does not escheat to petitioner, the Commonwealth of Pennsylvania. The court, therefore, enters the following:

*Order*

And now, January 8, 1963, the petition for escheatment of the Commonwealth of Pennsylvania is denied.